## MELISSA K. RAMIN *v.* KURT P. RAMIN
### (SC 17316)
### (SC 17319)

Borden, Norcott, Katz, Palmer, Vertefeuille, Zarella and Sullivan, Js.*

---

* This case originally was argued before a panel of this court consisting of Justices Borden, Norcott, Palmer, Vertefeuille and Zarella. Thereafter, the court, pursuant to Practice Book § 70-7 (b), sua sponte, ordered that the case be considered en banc. Accordingly, Justice Katz and Senior Justice

Sullivan were added to the panel, and they have read the record, briefs and transcript of the oral argument.

Argued September 20, 2005—officially released February 20, 2007

*Kenneth J. Bartschi*, with whom were *Brendon P. Levesque* and, on the brief, *Daniel J. Krisch, Thomas P. Parrino* and *Susan A. Moch*, for the appellant (plaintiff).

*James Ryan Mulvey*, for the appellee (defendant).

*Opinion*

BORDEN, J. The plaintiff, Melissa K. Ramin, appeals from the judgment of the trial court dissolving her thirty year marriage to the defendant, Kurt P. Ramin. On appeal, the plaintiff claims that the trial court: (1) improperly failed to adjust her proportionate share of the defendant's retirement assets after acknowledging an error in its initial determination of their value; (2) improperly relied on *Maguire* v. *Maguire*, 222 Conn. 32, 608 A.2d 79 (1992), in ordering her to be fully responsible for her own attorney's fees because she had suffi-

cient liquid assets; and (3) abused its discretion when it failed: (a) to hold the defendant accountable for his discovery misconduct by awarding the plaintiff attorney's fees or giving her a larger share of the marital assets as an offset; (b) to hold the defendant accountable for an allegedly fraudulent debt of $190,000 on his financial affidavit; and (c) to rule on her motion for contempt and sanctions based on the defendant's repeated failure to comply with the court's discovery orders. The plaintiff further contends that, if we conclude that the trial court properly followed existing precedent under *Maguire*, we should recognize an expansion of *Maguire* to apply to the facts of the present case. We conclude that the trial court improperly failed to rule on her motion for contempt and sanctions based on the defendant's repeated failure to comply with the court's discovery orders. Furthermore, we conclude that the facts of the present case justify an expansion of the *Maguire* rule. Accordingly, we reverse the judgment of the trial court with respect to the financial orders.[1]

The record reveals the following relevant facts. The parties were married on December 30, 1972.[2] In 1997, the parties effectively separated when the defendant was transferred by his employer to London, England, and the plaintiff remained at the marital home in Weston. In September, 1999, the plaintiff commenced this action seeking dissolution of the marriage and other relief.

[1] Because we conclude that the trial court improperly failed to rule on the plaintiff's motion for contempt and sanctions based on the defendant's repeated failure to comply with the court's discovery orders, and that the rule under *Maguire* should be expanded to apply to the plaintiff, and accordingly we remand the case for a new trial, it is unnecessary for us to reach the plaintiff's remaining claims.

[2] Two children were born of the marriage, both of whom had reached the age of majority at the time of judgment.

The trial court concluded that the evidence supported the plaintiff's claim that the defendant "used *at least* $395,000 in marital assets, including a partial distribution from his capital deposit account ($174,023), a payment of special compensation ($208,725), and a joint income tax refund ($12,736), for the purchase of such things as a BMW automobile, an apartment in Düsseldorf, Germany, and to maintain his lifestyle in Europe." (Emphasis in original.) The court also found that the defendant had attempted to "keep these assets out of reach by placing title in the names of other persons" and that the plaintiff had expended "enormous sums for attorney's fees, in large part to trace these assets, with limited success." The court further found that each party had sufficient assets to pay for their respective attorney's fees.

The court ordered the marriage dissolved. In accordance with its findings, the court also made the following financial orders: (1) that commencing September 1, 2003, the defendant make monthly payments to the plaintiff in the amount of $5000, until the death of either party, the remarriage of the plaintiff, or August 31, 2007, whichever shall occur sooner; (2) that the defendant convey his interest to the plaintiff, via quitclaim deed, in the jointly owned marital home in Weston; (3) that the defendant convey his interest to the plaintiff, via quitclaim deed, in jointly owned real estate at 750 State Street in Eaton Rapids, Michigan; (4) that the defendant retain his interest in inherited real property in Liebenwalde, Germany; (5) that the defendant retain his interest in an apartment in Düsseldorf, Germany; (6) that each party retain personal property and home furnishings in their respective residences; (7) that each party retain their respective automobiles; (8) that each party retain, except as otherwise set forth in the court's orders, their respective savings, checking and money market accounts; (9) that the defendant retain his

shares of The Translation Group, Ltd., stock, moneys held by Martina Meyer, shares of Smith Barney stock held by Theodora Landgren and gold coins from a Mexican directorship; (10) that the plaintiff retain her jewelry and personal effects and her Merrill Lynch investment account; (11) that the defendant's PricewaterhouseCoopers Keough plan, his PricewaterhouseCoopers 401 (k) plan, his PricewaterhouseCoopers retirement benefits accumulation plan and his PricewaterhouseCoopers qualified XC retirement plan be apportioned between the parties, with the plaintiff receiving 65 percent of each plan and the defendant receiving 35 percent of each plan; (12) that effective September 1, 2003, the defendant pay to the plaintiff 35 percent of the monthly payments he receives under his nonqualified PricewaterhouseCoopers retirement plan; (13) that each party receive 50 percent of the defendant's PricewaterhouseCoopers nonqualified XC NET P&PA retirement plan and that, in the event that the defendant should predecease the plaintiff, she will receive 100 percent of any portion of the survivor benefit vested and accrued as of the date of the court's order; (14) that the defendant, beginning December 1, 2007, pay to the plaintiff 35 percent of the gross monthly payment he receives pursuant to an annuity created with the undistributed balance of his deposit capital plan through PricewaterhouseCoopers; (15) that the plaintiff retain her interest in her Louis Dreyfus Holding Company 401 (k) plan, her Louis Dreyfus Holding Company pension plan, and her Merrill Lynch individual retirement account; (16) that the defendant retain his interest in the Emery Industries, Inc., pension plan, the Fidelity Investments individual retirement account, and the Smith Barney individual retirement account; (17) that the parties divide equally the balance of the Scot Equities Fund(s); (18) that the defendant maintain the existing decreasing term life insurance and name the

plaintiff his beneficiary as long as his alimony obligation exists; and (19) that each party be responsible for their respective attorney's fees and costs incurred in connection with this action.

The plaintiff appealed to the Appellate Court from the judgment of the trial court. Thereafter, the defendant moved to reargue and the trial court granted the plaintiff's motion for articulation and granted a hearing on the defendant's motion to reargue. Following the hearing, the trial court denied the defendant's motion for reargument and clarified its original decision. The plaintiff then filed a separate appeal after the trial court's ruling on the motion to reargue. The Appellate Court subsequently granted the plaintiff's motion to consolidate the two appeals. Thereafter, we transferred the consolidated appeals to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

I

We first consider the plaintiff's claim that the trial court abused its discretion in declining to rule on her motion for contempt and sanctions, filed in court on August 14, 2002, based on the defendant's repeated failure to comply with the court's discovery orders. Because we conclude that the trial court had no discretion to mark the plaintiff's motion "off" the calendar, we agree with the plaintiff that the court's action was improper.

The following additional facts are relevant to our resolution of this claim. On August 2, 2000, the plaintiff filed her first discovery request for disclosure of facts and production of records. After the defendant failed to comply with her request, the plaintiff filed a motion for contempt. On October 23, 2000, the court ordered the defendant to comply with the discovery request. When the defendant produced, in response to the court's order, a computer disk that the plaintiff claimed

was incomplete and indecipherable, the plaintiff filed a second motion for contempt on January 29, 2001. The parties then entered into a stipulation, which was made an order of the court on March 26, 2001, providing that the defendant would sign, acknowledge and deliver an authorization to release personal information to the plaintiff's attorney. Although the defendant subsequently signed an authorization allowing his employer to release information to the plaintiff's attorney, she was unsuccessful in obtaining information from the employer, and the defendant failed to produce the requested documents and information. Because the defendant persisted in his noncompliance with discovery requests, on July 6, 2001, the plaintiff filed a third motion for contempt, prompting the court to issue an order, dated July 23, 2001, directing the defendant to provide answers to the production requests within thirty days of the court's order. The court additionally imposed $2500 in sanctions against the defendant for his failure to comply with previous discovery requests and orders. On August 22, 2001, the defendant provided the plaintiff with documents purporting to be complete disclosure. The plaintiff advised the defendant in writing in September, 2001, that the production was incomplete, and on October 18, 2001, the plaintiff provided the defendant with a detailed list of the documents still missing from disclosure and made a formal written demand for the $2500. The plaintiff then filed her fourth motion for contempt on January 7, 2002, which led the court to impose $40,000 in attorney's fees and sanctions against the defendant. On February 22, 2002, the parties participated in discovery mediation, which resulted in an agreement between the parties for the production of documents by the defendant; that agreement was made an order of the court on the same date. Following the mediation, the defendant produced some documents, but the production was incomplete.

Thereafter, on August 14, 2002, the plaintiff filed her fifth motion for contempt. In the motion, the plaintiff detailed the history of her production requests, motions for contempt, resulting court orders, and the defendant's consistent failure to comply with discovery requests and orders. The motion also identified in great detail the specific items of discovery that the defendant had not yet supplied pursuant to those orders.[3] Accord-

[3] The following is a summary of what the plaintiff claimed that the defendant had not provided to the plaintiff, despite orders to do so: the defendant's United Kingdom tax return due April, 2002, and signed copies or supporting documentation for the tax returns that the defendant had supplied; from PriceWaterhouseCoopers, K-1 forms for fiscal years ending September 30, 1997, 1998 and 2001, and 1099 forms from fiscal years ending September 30, 1997, 1998, 1999, 2000 and 2001; a copy of the defendant's 1999 amended federal income tax return; Citibank Visa account summaries from 1998 to the present, along with a copy of the defendant's letter to Citibank requesting the summaries; Citibank United Kingdom banking account statements for five separate accounts for December 17, 1997, through December, 1998, and after October 31, 2001; statements for the defendant's Citibank United States accounts from January 1, 1998 through November 16, 1998, and December 14, 2001, to the present; the defendant's 2001 tax returns or requests for extensions for filing; copies of letters sent to the main branches of three German banks confirming whether the defendant had accounts with any of those banks and the status of any such accounts (the defendant had mailed letters only to local branches and received no responses); year end account statements for the defendant's Smith Barney accounts for 2000, 2001, and a copy of his then current statement—the defendant provided only incomplete statements for some of the requested periods; confirmation that the defendant had requested copies of PriceWaterhouseCoopers' expense reports and reimbursement requests; any documents from the International Accounting Standards Board showing a cumulative year-to-date total of his income for 2001, other than the defendant's pay stubs and not including his pay stub from January, 2002; documentation regarding any payments made to Theodora Landgren, the defendant's mistress, arising from The Translation Group, Ltd., stock transactions including loan documentation, repayment of any loan and transactions concerning sale of stock; summary plan descriptions for any retirement plans with PriceWaterhouseCoopers; a copy of the defendant's credit report; only incomplete portions of *some* of the requested Merrill Lynch account statements; updated individual retirement account, Keogh 401 (k) and other retirement plans, with the exception of a one page Internet printout showing 401 (k) savings; documents concerning the defendant's relationship with BTS WordHouse, a Netherlands subsidiary of The Translation Group, Ltd.; statements from various American Express card accounts; documents pertaining to the defendant's inheritance from his father; the defendant's foreign sources of income, as well as income or

ingly, the plaintiff requested that the court order the defendant "to produce all documents within one (1) week of the hearing on this [m]otion or to appear in [c]ourt to show cause why he should not be incarcerated for willful contempt of the [c]ourt's orders and to pay sanctions to the [p]laintiff and her reasonable attorney's fees."

When the motion came on for hearing before the court on September 9, 2002,[4] the plaintiff explained that she had filed the motion because, although the defendant had produced some documents since the mediation that had taken place on February 22, 2002, she had not received the majority of the production that the court had ordered at that time. She also reminded the court that in April, 2002, the court had held a discovery status conference in the matter, during which the defendant had acknowledged that discovery remained incomplete, yet the plaintiff had not since received any further production from the defendant.

After hearing the plaintiff's brief presentation of some of the procedural background that had prompted her to file the fifth motion for contempt, the court, noting that the action had been initiated in late September, 1999, stated that it "probably is the oldest case on my docket," and that the case had "been going on far too long, folks. This case is going to be tried." When informed that trial dates had been set for December 1, 2 and 3, 2002, and a deposition of the defendant had

honoraria derived from the defendant's position on the board of directors at various unnamed institutions, or income related to the defendant's various publications; and lastly, any canceled checks or check registers for the defendant's bank accounts.

[4] The dissent's contention that the mere fact that the court held a hearing on the motion means that the court *considered* the motion is not supported by the record. The transcript of the hearing, on the contrary, shows that the trial court did not consider the plaintiff's motion, and in fact directed much of its remarks to explaining to the plaintiff exactly why it refused to consider the motion.

been scheduled for October, 2002, the court repeated that "this has just got to be tried." When the defendant's attorney asserted that "[s]everal things have been said in this motion and the characterizations just aren't correct," and when the plaintiff's attorney reminded the court that she had not had an opportunity to present her arguments on the motion in a systematic and detailed manner, and further pointed out that the defendant's attorney was responding to the motion "in a piecemeal fashion," the court responded: "[T]ime out both of you . . . the way I look at this is I think . . . this has been done to death, and . . . I just don't see how further sanctions are going to help. I don't see where further orders are going to help. This case needs to be tried. It's time for this case to be tried. Three years is more than enough to get it all together one way or the other, and if there's been bad faith . . . I'm sure that will come out at trial. . . . I'm just appalled. September 28, 1999. That's the return date on this case."

The plaintiff's attorney then again reminded the court that she still had not received documents and authorizations requested in the August 14, 2002 motion, and asked the court: "[W]hy does it then become my burden to say again and again and again we are still waiting for these documents, they haven't come?" The plaintiff's attorney then attempted to bring to the court's attention some of the specific items of discovery that the defendant had not produced despite court orders to do so, referring specifically to Citibank Visa statements, American Express statements and a copy of the defendant's 1999 amended tax return, all of which had been requested but not produced, despite court orders for compliance.

When the plaintiff's attorney attempted to continue, the court said: "Folks, stop it. . . . [A]re you getting the message from me? Stop it. I really don't want to hear anymore about this. Three years is enough to get

this case tried one way or the other. And I have not got the time, I haven't got the patience to go through line-by-line on a discovery thing that's been kicking around for three years. I just don't have it.

"I've got . . . 200 cases on my docket that are over one year old. I inherited that, and I have not been able to move that log jam in [the] two years that I've been sitting here. And I'm looking through this file. This whole thing is all about . . . discovery. That's what you've been fighting. . . .

"[T]his case should have been tried two years ago. So try it, folks. Get your depositions done. . . . [Y]ou're scheduled for trial. Just take your best shot. . . . [T]here's no such thing as a [100] percent job. There's just no such thing anymore . . . ."

When the plaintiff's attorney attempted to respond, the court interrupted and said: "I'm sure you have a core of good, vital information that you can work with. . . . It's time to get this thing done, and . . . if I start to have this hearing, I'll be . . . all morning on this, tomorrow, going through this one line item at a time. . . . We just don't have the manpower, the resources, to do this."

The plaintiff's attorney then stated to the court: "You're telling me we have a core of documents, but I don't. I don't have one check register from [the defendant]. I don't know where he writes his check[s]. . . . I don't have that information." The court responded: "[T]hen you take his deposition in October and you ask some of those questions, and maybe we can zero in on some of this, but I can't take a shotgun blunderbuss approach to discovery on a three year old case. It's got to be tried. . . . I've issued the largest sanctions I have issued in my two and a half years on the bench against [the defendant]. All right? So I think it's time to try this case. That's the message I have for both of you. Take

your depositions, see where you go.[5] If there's something very, very specific as far as discovery is concerned, I mean specific and vital, major case, following the deposition, then I'll hear you on it, but . . . we'll see you guys in December." The record indicates that the court marked the plaintiff's motion "OFF: 9/9/02."[6]

The abuse of discretion standard applies to a trial court's decision on a motion for contempt. *Sablosky* v. *Sablosky*, 258 Conn. 713, 721, 784 A.2d 890 (2001). The facts of this case, however, present the question of whether a trial court has the discretion to refuse to *consider* a party's motion for contempt. We have already squarely addressed this issue, concluding that, in the absence of "an extreme, compelling situation," a trial court that has jurisdiction over an action lacks authority to refuse to consider a litigant's motions.

[5] The plaintiff ultimately did depose the defendant over a period of five days, in order to inquire further as to his finances. The transcript of that deposition, however, makes clear that the plaintiff was required to do so without access to many of the documents that the defendant had been ordered to disclose.

[6] We disagree with the dissent's contention that the plaintiff failed to "object" to the court's refusal to rule on her motion. First, unlike an evidentiary offer, there is no requirement that a party file a formal "objection" to a court's ruling—or refusal to rule—on a motion. Second, the entire transcript evidences the numerous ways in which the plaintiff attempted to persuade the court to rule on the motion in her favor. For example, after the court stated that the case "has just got to be tried," the plaintiff pointed out to the court that she had "not had an opportunity to go through the motion and argue the motion line-by-line." Later in the hearing, the plaintiff attempted to explain to the court the extent of the defendant's continued noncompliance in the face of repeated discovery requests made by the plaintiff seeking court-ordered production from the defendant. Referring to the burden placed on her in making those repeated requests, the plaintiff asked the court, "[W]hy does it then become my burden to say again and again and again we are still waiting for these documents, they haven't come." In response to the court's assertion that she had a "core of good, vital information that you can work with," the plaintiff responded: "You're telling me we have a core of documents, but I don't." In response to this final attempt to persuade the court to hear her motion, the court instructed the plaintiff to take the defendant's deposition, and to come to the court to be heard further if she had something "specific and vital, major case . . . ."

*Ahneman* v. *Ahneman*, 243 Conn. 471, 482–84, 706 A.2d 960 (1998).

In *Ahneman*, the defendant had filed an appeal from the trial court's postjudgment order modifying alimony and support. Id., 473. While the appeal was pending, the defendant filed in the trial court a number of motions that concerned both financial and nonfinancial issues. Id., 474. The trial court specifically stated that it would consider the defendant's motions regarding nonfinancial issues but refused to consider her motions dealing with financial issues. Id., 476.

On the ultimate appeal to this court,[7] we concluded that "the trial court lacked authority to refuse to consider the defendant's motions." Id., 482. In support of our conclusion, we first specifically held that, in accordance with well established jurisprudence in both the family and nonfamily areas, the filing of an appeal did not deprive the trial court of jurisdiction to consider motions raising postjudgment issues. Id., 483.

We then addressed the merits of the trial court's refusal to consider the defendant's motions. We stated: "More fundamentally, basic principles of jurisprudence refute the plaintiff's proposition that a trial court has discretion, based on notions of judicial efficiency, to decline to exercise its jurisdiction by refusing to consider certain motions. Courts are in the business of ruling on litigants' contentions, and they generally oper-

[7] The defendant had appealed to the Appellate Court from the trial court's refusal to consider her financial motions. See *Ahneman* v. *Ahneman*, supra, 243 Conn. 477. The Appellate Court dismissed the appeal for lack of final judgment; id.; and we granted certification to appeal on the final judgment issue. Id., 472 n.1. On the certified issue, we concluded that the trial court's refusal to consider the defendant's motions was a final judgment for purposes of appeal. Id., 479. In order to avoid further confusion and delay, and because the parties had briefed and orally argued the issue, however; id., 482; we then went on to consider "the closely related issue of the propriety of the trial court's refusal to consider the defendant's motions." Id., 472 n.1.

ate under the rule essential to the efficient administration of justice, that where a court is vested with jurisdiction over the subject-matter . . . and . . . obtains jurisdiction of the person, it becomes its . . . duty to determine every question which may arise in the cause . . . . This general rule is particularly important in the context of marital dissolution cases because of the likelihood of continuing changes in the parties' circumstances requiring continuing dispute resolution by the court." (Citation omitted; internal quotation marks omitted.) Id., 484. We also explicitly rejected the notion that principles of judicial efficiency could serve as a justification for a trial court to "decline to exercise its jurisdiction by refusing to consider certain motions." Id. Accordingly, we remanded the case to the Appellate Court with direction to remand it further to the trial court for prompt resolution of the defendant's motions. Id., 485.

This reasoning of *Ahneman* applies directly to the present case. In refusing to decide the motion before it by marking it "off," the trial court abdicated its fundamental obligation to decide all matters properly presented to it. Just as in *Ahneman*, the court had the case and the plaintiff's motion properly before it. Just as in *Ahneman*, it was the court's duty to determine the questions raised by the motion. Indeed, just as in *Ahneman*, this was a marital dissolution case, and the plaintiff had a compelling need for enforcement of the court's prior discovery orders in order to prepare and to try her case; this was part of the court's duty of "continuing dispute resolution . . . ." Id., 484.

We also recognized, in *Ahneman*, however, "that exceptions to the general rule that a trial court must consider and decide on a reasonably prompt basis all motions properly placed before it may exist *in an extreme, compelling situation.* For example, we do not rule out the possibility that a trial court may have

discretion to refuse to entertain or decide motions in order to prevent harassing or vexatious litigation. See *In re Martin-Trigona*, 737 F.2d 1254 (2d Cir. 1984) (affirming, in substantial part, District Court's order barring filings by defendant without first obtaining leave of court, vacating order in minor respect, and entering preliminary injunction barring his filings in Court of Appeals without leave of court), aff'd on remand, 763 F.2d 140 (2d Cir. 1985) (affirming District Court's amended order), cert. denied, 474 U.S. 1061, 106 S. Ct. 807, 88 L. Ed. 2d 782 (1986), motions denied, 795 F.2d 9 (2d Cir. 1986) (injunction as to filings in Court of Appeals made permanent), modified sub nom. *Martin-Trigona* v. *Cohen*, 876 F.2d 307 (2d Cir. 1989) (granting leave to appeal where defendant had standing), motions denied sub nom. *In re Martin-Trigona*, 9 F.3d 226 (2d Cir. 1993) (seeking disclosure of identity of judges ruling on leave to file applications). Likewise, there may be other circumstances in which a trial court properly could refuse to consider certain motions." (Emphasis added.) *Ahneman* v. *Ahneman*, supra, 243 Conn. 484–85.

There is no claim that the plaintiff's attempt to enforce the court's prior orders of discovery was harassing or vexatious, nor did the trial court suggest that such a conclusion formed the basis of its decision. The question, therefore, is whether this case presents some "other [extreme and compelling circumstance] in which a trial court properly could refuse to consider" the plaintiff's motion. Id., 485. We conclude that it does not. In order to understand why that is so, it is necessary to review the plaintiff's motion and the court's response to it.

This was a case in which the financial situation of the defendant was extremely complicated. Furthermore, the complications were exacerbated by the following facts: it was the defendant who had sole access

to his financial information and documents; during the proceedings he lived and was employed in London, while the plaintiff remained in Connecticut; one of his mistresses, Landgren, was also a business associate to whom he had executed a promissory note in the amount of $450,000, in purported connection with a public offering by her company, The Translation Group, Ltd., of which the defendant claimed to be a part owner; and the plaintiff claimed that the promissory note to Landgren was fraudulent and that certain substantial payments that the defendant had made to Landgren while this case was pending, purportedly in payment of that note, were really attempts to defraud the plaintiff of part of the marital estate.

In addition, it is undisputed that the case was rife with discovery misconduct by the defendant. During the pendente lite process, pursuant to four motions for contempt by the plaintiff, the court had ordered the defendant to make disclosures that he had failed to make, and had severely sanctioned the defendant. In this connection, it is significant that, in the proceedings at issue on September 9, 2002, the plaintiff was not attempting, at a late stage, to obtain additional discovery that she had failed to request earlier; she was attempting merely to secure, prior to the trial, the discovery that the court already had ordered the defendant to supply to her. Thus, she merely was requesting that the court enforce the orders that it earlier and repeatedly had entered.

All of these facts made both the plaintiff's need for full discovery and, correspondingly, the defendant's obligation to supply full and fair disclosure compelling. See *Billington* v. *Billington*, 220 Conn. 212, 221, 595 A.2d 1377 (1991). Furthermore, it is clear from the record that the great portion of the delay in the case from the time of its filing in September, 1999, to the hearing in September, 2002, is fairly attributable, not

to the plaintiff, but to the defendant's repeated failures to comply with the discovery requests of the plaintiff and with the numerous orders of the court mandating such compliance.

A brief examination of the court's expressed reasons for refusing to consider the plaintiff's motion reveals that the court did not base its refusal on any extreme and compelling circumstance that would have justified its decision. In summary, the court's comments reveal the following reasons for not ruling on the plaintiff's motion: (1) because the motion was lengthy and detailed, it would consume too much of the court's time to consider it, particularly in light of the court's backlogged docket; (2) the discovery stage of the case already had been pending too long, three years, and, therefore, the case should go to trial without further delay; (3) the plaintiff had enough information to go forward and should take her "best shot," because "there's no such thing as a [100] percent job"; and (4) the imposition of further sanctions on the defendant would not "help," that is, they probably would not result in the defendant's cooperation. None of these reasons proffered by the court in support of its refusal to consider the plaintiff's motion presents an extreme and compelling circumstance that would have justified the court's refusal to consider the plaintiff's motion, which was properly before it.

We explain briefly why each of the court's proffered reasons for its refusal to entertain the plaintiff's motion does not justify its decision. First, a court may not refuse to consider a motion in one case because such consideration will delay the disposition of other cases filed by other litigants and because the court believes it has neither the time nor the resources to address a lengthy and detailed motion. On the contrary, "[c]ourts are in the business of ruling on litigants' contentions . . . ." *Ahneman* v. *Ahneman,* supra, 243 Conn. 484.

Such a justification for refusing to consider a motion implicitly elevates the other cases on the docket to a status superior to that of the present case, in that their ultimate disposition is deemed by the court to be somehow more important than the consideration of the motion before it. Similarly, it was inappropriate for the court to base its refusal to consider the motion on the fact that the trial judge viewed himself as having "inherited" more than 200 family cases upon his assignment to the Stamford-Norwalk judicial district and that he was frustrated at not having been able "to move that log jam in [the] two years that [he had] been sitting [there]." The court's desire to clear its docket is simply not a justifiable basis to refuse to consider a motion properly before it.

Second, under the circumstances of the present case, the imposition of a three year time limit on the discovery process ignores the fact that it was the defendant's abuse of the discovery process—the very abuse that was the subject of the motion—that was responsible for the delay. Such a rule effectively penalizes the innocent party, and rewards the party who has abused the discovery process.[8] The imposition of a three year limit was

[8] We recognize that a trial court, in order to deter litigation harassment and undue delay in the disposition of the cases on its docket, has an inherent managerial power to impose reasonable limits on discovery, so long as the parties are given due notice of such limits prior to their imposition. We also recognize that "the trial court has the responsibility to process cases in a timely and efficient manner," and that principles of effective case flow management are "based upon the premise that it is the responsibility of the court to establish standards for the processing of cases and, also when necessary, to enforce compliance with such standards." *Jaconski* v. *AMF, Inc.*, 208 Conn. 230, 233, 543 A.2d 728 (1988). These principles permit the court to sanction a party who has violated those limits and standards. See id., 235. They do not permit the court, as the court did here, ex post facto to place an arbitrary limit on discovery to the benefit of the defendant who had abused the discovery process, and to the detriment of the plaintiff who merely sought to obtain what the court already and repeatedly had ordered the defendant to supply to her.

also arbitrary, based on an unfounded conclusion that, despite the complicated nature of the case and despite the defendant's discovery misconduct that had produced the delay, three years was either too long or long enough.

Third, the court's suggestion that the plaintiff had secured enough discovery ignores the plaintiff's claims to the contrary—again, the subject of the very motion that the court refused to consider. Moreover, the court's advice to counsel that she should take her "best shot," and that the plaintiff should not expect 100 percent performance is not reconcilable with the ethical duty of zealous representation that counsel owes to a client. We have admonished counsel that they are responsible for "diligent investigation and preparation" and "for full and fair disclosure, for a searching dialogue, about all of the facts that materially affect the client's rights and interests . . . ." (Internal quotation marks omitted.) *Grayson* v. *Wofsey, Rosen, Kweskin & Kuriansky*, 231 Conn. 168, 176, 646 A.2d 195 (1994). In fulfilling this responsibility, an attorney must attempt to present her client's case on a "[100] percent" basis, at least in the sense stated in this context, namely, that an attorney will give the client a "[100] percent" effort on her behalf. An attorney and client may agree between themselves to limit discovery efforts, or other litigation procedures, on a cost benefit basis; but that does not give the court the power to impose such a limit on such a basis. Furthermore, a suggestion that counsel should give less than 100 percent performance places the trial counsel in a marital dissolution case in a very difficult, if not impossible, position. We have held that, in a legal malpractice claim against a marital attorney, the defendant attorney may be held to be negligent for failure properly "to discover and value the [client's] business interests and related assets . . . ." Id., 181–82.

Fourth, the court may not refuse even to consider a motion for contempt based on its doubts that the imposition of further sanctions will result in the wrongdoer's compliance. Such a justification invites parties in a dissolution action to defy court orders and be recalcitrant in their noncompliance because eventually courts will throw up their hands in defeat.

Subsequent proceedings in the present case illustrate precisely how a court's abdication of its responsibility to oversee the discovery process, when confronted with a consistently noncompliant party, benefits the wrongdoer and encourages him to persist in his noncompliance. Specifically, at the defendant's subsequent deposition, rather than utilizing that time to question the defendant based on information that he had provided and using that information to develop a trial strategy, the plaintiff was forced to spend her time with the defendant to question him regarding the very same documents the production of which already had been ordered by the court on numerous occasions in response to her multiple motions for contempt. Furthermore, the defendant's conduct during the deposition was defiant, disrespectful and uncooperative. During the course of the deposition, the defendant responded to the plaintiff's requests for already requested documents by claiming that: he had already produced the documents; he believed that his employer, and not he, was responsible for producing requested documents; in his judgment, the plaintiff did not need certain requested information; he had produced the requested documents at the last deposition; and the volume of requested documents was too vast to allow him reasonably to comply with production requests. At other times, the defendant responded to requests for documents by becoming agitated, complaining that the plaintiff's requests were "crazy," "nuts" and "sick." When the plaintiff's counsel asked the defendant to produce his

credit cards, he became furious and threw his wallet at her. He repeatedly used obscenities throughout the proceedings, threatened at one point to leave, responded sarcastically to questions, and during one portion of the proceedings, was reading a magazine. The defendant's behavior during his deposition exemplifies why a trial court should not refuse to sanction a non-compliant party for failure to obey court orders.

Most importantly, although the defendant had produced some of the requested documents during his deposition, the plaintiff still had not received full production at the time of trial. At the beginning of trial, the plaintiff filed a motion in limine seeking the following relief, pursuant to Practice Book § 13-14,[9] for the defendant's failure to comply with discovery orders: (1) the entry of an order that, as to the matters regarding which the plaintiff had sought discovery, and such discovery had been ordered disclosed, but which the defendant nevertheless had failed to disclose, in violation of the court's orders, the facts be taken as established in accordance with the plaintiff's claims on those matters; and (2) as to those matters, the entry of an order prohibiting the defendant from offering testimony

---

[9] Practice Book § 13-14 provides in relevant part: "(a) If any party has failed to answer interrogatories or to answer them fairly, or has intentionally answered them falsely or in a manner calculated to mislead, or has failed to respond to requests for production or for disclosure of the existence and contents of an insurance policy or the limits thereof . . . or has failed to comply with a discovery order made pursuant to Section 13-13, or has failed to comply with the provisions of Section 13-15 . . . or has failed otherwise substantially to comply with any other discovery order made pursuant to Sections 13-6 through 13-11, the judicial authority may, on motion, make such order as the ends of justice require.

"(b) Such orders may include . . .

"(3) The entry of an order that the matters regarding which the discovery was sought or other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order;

"(4) The entry of an order prohibiting the party who has failed to comply from introducing designated matters in evidence . . . ."

or documents to rebut the plaintiff's claims regarding those matters.[10]

The court declined to grant the plaintiff's motion in its entirety. Instead, the court stated that it would rule

[10] The plaintiff filed the motion in limine at the beginning of trial in response to the court's direction, during the September 9, 2002 hearing, in response to the plaintiff's contention that, despite the court's insistence to the contrary, she did *not* have "a core of good, vital information that [she could] work with," that the plaintiff should "take [the defendant's] deposition in October and you ask some of those questions, and maybe we can zero in on some of this . . . ." The court then reiterated, however, what it already repeatedly had stated: "[I]t's time to try this case. That's the message I have for both of you." The court also imposed a much more demanding standard for the plaintiff to meet after the deposition, instructing the plaintiff that the court would hear her then, but only if "there's something *very, very specific* as far as the discovery is concerned, I mean *specific and vital, major case* . . . ." (Emphasis added.)

The dissent's characterization of the trial court's decision as the "functional equivalent" of denying the plaintiff's motion without prejudice ignores the fact that the court set a much higher standard for the plaintiff to meet before the court would address the defendant's discovery misconduct. After the defendant had complied only partially at his deposition, therefore, the plaintiff filed her motion in limine at the beginning of trial in an attempt to meet that higher standard. The dissent also contends that the plaintiff in effect waived any procedural defect by agreeing, at the beginning of the trial, to the trial court's suggested procedure on her motion in limine. This contention wholly ignores the procedural context at that point, because it ignores the significance of the fact that the plaintiff was compelled to seek relief at the very outset of trial, rather than prior to it—namely, that the delay in the availability of relief for the defendant's discovery abuse changed the very nature of the relief that she was able to request from the court. It would have been, as a practical matter, impossible for the plaintiff to renew her motion for contempt at that time, particularly given that the trial court had set a higher standard for her to meet in seeking further relief. At that point, therefore, any renewal of the plaintiff's August 12 motion for contempt would have been pointless, as well as any objection she may have raised regarding the trial court's decision to refuse to consider that motion.

Moreover, we disagree with the dissent that the plaintiff's failure to renew her request for sanctions following the deposition of the defendant, or to request a new judge at the time of trial, signifies that the plaintiff had not construed the court's decision to mark off her August 12 motion for contempt as an absolute refusal to consider the motion. On the contrary, the plaintiff's failure simply to renew her request for sanctions following the defendant's deposition signifies that she did understand the trial court's refusal to consider the August 12 motion to be absolute, unless she could meet the higher bar. Furthermore, the plaintiff was under no obligation to request that the

on the motion in limine on a "case-by-case" basis, as each matter arose during the course of the trial. During the trial, the plaintiff raised the motion in limine twice, once in regard to a transfer of funds to Meyer and once in regard to a transfer of funds to Landgren. The trial court denied, as unnecessary, the requested relief as to the defendant's transfer of funds in the amount of $194,023 to Meyer,[11] and granted relief as to the defendant's transfer of funds in the amount of approximately $177,000 to Landgren.

In the end, then, the plaintiff did receive partial relief for the defendant's steadfast refusal to comply with the court's prior orders of production. We cannot say, however, whether the plaintiff would have been successful in discovering further evidence of the defendant's concealment of assets, a success which in turn could have resulted in a greater disallowance of the defendant's explanations in response to the plaintiff's claims, and, therefore, in the plaintiff's receiving a larger portion of the marital estate. We cannot answer that question because the court's refusal to consider the plaintiff's August 14, 2002 motion for contempt permitted the defendant to stonewall the plaintiff up to and including the trial. This dilemma aptly illustrates why as a matter of policy a court should not have discretion, in the absence of extreme and compelling circumstances, to refuse to consider a party's motion properly before it.

We next turn to the remedy for the court's improper refusal to consider the plaintiff's motion. Because the case already has been decided in the wake of that abuse,

case be assigned to a new judge. Such a request would have prolonged the matter even further.

[11] The court determined that it was unnecessary to grant the relief requested pursuant to the plaintiff's motion in limine because, in its opinion, the defendant was not contesting the transfer to Meyer, and, therefore, the fact of the transfer had been "established to [the] court's satisfaction."

we cannot simply remand it for the court to consider the motion, as we were able to do in *Ahneman*. Thus, we are required to decide who has the burden of establishing the harm flowing from the trial court's error, in order to decide whether the court's error requires a new trial. Although ordinarily the burden to establish harm is borne by the party who claims the error—in this case, the plaintiff—we conclude, to the contrary, that under the unique circumstances of this case the defendant should bear the burden of showing no harm to the plaintiff as a result of the trial court's refusal to consider the plaintiff's motion.

First, it would be grossly unfair to the plaintiff to require her to establish precisely how she was harmed in proving her case by not having access to the extensive list of already ordered discovery materials to which she never gained access solely as a result of the court's refusal to consider her motion. In other words, the court already had ruled that she was entitled to discovery of those materials; see footnote 3 of this opinion; but then improperly refused to enforce its prior orders. She reasonably cannot be expected to establish how she was harmed in proving her case by reference to materials to which she was, by virtue of judicial orders, entitled to see but nonetheless never saw. Indeed, to take but one example, the trial transcript shows that the plaintiff repeatedly, but unsuccessfully, attempted to prove, by reference to various financial records, that the defendant's $450,000 promissory note to Landgren was fraudulent and that, therefore, the payments that he had made on that note were simply diversions of marital assets. Without the documents that the plaintiff had sought through her motion, it is impossible to determine—and it would be equally impossible for the plaintiff to establish—whether the plaintiff's effort would have been successful had the court heard her motion and decided it in her favor. Thus, the defendant was

the beneficiary of the court's improper refusal to consider the plaintiff's motion. Furthermore, the defendant remained in total control of all of the materials sought by the plaintiff and ordered to be disclosed to her by the court, and, therefore, he reasonably could be expected to be able to establish that the materials would not have helped the plaintiff prove her case. Cf. *Weinstein* v. *Weinstein,* 280 Conn. 764, 773, 911 A.2d 1077 (2007) (concluding that party holding investment account bore burden to show that low rate of return on his investments was reasonable, rather than placing burden on other spouse to show that rate was unreasonable). To conclude otherwise would be to encourage the kind of gamesmanship and evasion of discovery that the defendant engaged in here.

Second, placing the burden in this respect on the defendant who failed to comply fully with the court's orders is consistent with our decision in *Billington* v. *Billington,* supra, 220 Conn. 221, in which we articulated the requirement of full and frank mutual disclosure in marital cases. In doing so, we analogized the marital relationship, even in the context of a dissolution case, to "the special relationship between fiduciary and beneficiary," insofar as the requirement of disclosure is concerned. Id. Just as the relationship between fiduciary and beneficiary "compels full disclosure by the fiduciary"; id., citing *Pacelli Bros. Transportation, Inc.* v. *Pacelli,* 189 Conn. 401, 407–409, 456 A.2d 325 (1983); "we believe that no less disclosure is required of such parties when they come to court seeking to terminate their marriage." *Billington* v. *Billington,* supra, 221. Similarly, just as, once it has been shown that a fiduciary has engaged in self-dealing, he has the burden to establish the fairness of the transaction by clear and convincing evidence; see *Cadle Co.* v. *D'Addario,* 268 Conn. 441, 457, 844 A.2d 836 (2004); so, as in the present case, when the defendant has breached his fiduciary-like obli-

gations of discovery to the plaintiff as ordered by the court, he should bear the burden of establishing that his breach of that obligation did not harm the beneficiary of that obligation.

In the present case, the defendant has not attempted to establish such lack of harm; his sole contention on this claim by the plaintiff is that the court did not abuse its discretion in refusing to consider the plaintiff's motion. Because, as we have stated many times, the financial orders in a marital case are like a mosaic; see, e.g., *Grimm* v. *Grimm*, 276 Conn. 377, 386, 886 A.2d 391 (2005), cert. denied, 547 U.S. 1148, 126 S. Ct. 2296, 164 L. Ed. 2d 815 (2006); *Greco* v. *Greco*, 275 Conn. 348, 354, 880 A.2d 872 (2005); *Morris* v. *Morris*, 262 Conn. 299, 307, 811 A.2d 1283 (2003); and because the defendant has not established that the mosaic likely would have been the same despite his failure to disclose as ordered by the court and despite the court's refusal to consider the plaintiff's motion, the entire mosaic must be refashioned. Accordingly, the judgment must be reversed as to the financial orders and remanded for a new trial on the financial issues.

II

Because it is likely to arise on remand, we next address the plaintiff's claim that the trial court improperly interpreted our decision in *Maguire* v. *Maguire*, supra, 222 Conn. 32, to require that the court should not award attorney's fees when a marital party is financially able to pay them, and the payment of the fees would not undermine the other financial orders, even in a case in which the party seeking attorney's fees incurred those fees because of the other party's misconduct. In the alternative, the plaintiff argues, if the trial court correctly applied the existing law under *Maguire,* we should now recognize an exception to the rule to afford the trial court the discretion to award such fees as part

of the final financial orders when the innocent party has incurred substantial attorney's fees because of the other party's egregious litigation misconduct and the other orders of the court have not already adequately addressed that misconduct.

We conclude that the trial court's ruling declining to award attorney's fees as part of the final financial orders was based on its accurate reading of *Maguire*. A fair reading of the court's memorandum of decision establishes that it simply applied *Maguire* in denying the plaintiff's request for attorney's fees, which was specifically based on the defendant's litigation misconduct, because she had ample liquid funds to pay her attorneys.[12] Thus, the court never exercised any discretion as to whether to make such an award based on the claimed misconduct and on whether that misconduct had already been adequately addressed by its prior orders. We also conclude, however, that *Maguire* should be expanded to provide a trial court with the discretion to award attorney's fees to an innocent party who has incurred substantial attorney's fees due to the egregious litigation misconduct of the other party when the trial court's other financial orders have not adequately addressed that misconduct.

General Statutes § 46b-62 governs the award of attorney's fees in dissolution actions and provides that "the court may order either spouse . . . to pay the reasonable attorney's fees of the other in accordance with their respective financial abilities and the criteria set forth in [General Statutes §] 46b-82. . . ." These criteria

---

[12] The sum of the trial court's statements in its memorandum of decision with regard to the attorney's fees were: (1) "The court finds that each party has sufficient liquid assets and each party shall be responsible for their separate attorney's fees and costs incurred in connection with this action. *Maguire* v. *Maguire*, [supra, 222 Conn. 32]."; and (2) "Each party shall be responsible for their respective attorney's fees and costs incurred in connection with this action."

include "the length of the marriage, the causes for the . . . dissolution of the marriage . . . the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate and needs of each of the parties and the award, if any, which the court may make pursuant to [General Statutes §] 46b-81 . . . ." General Statutes § 46b-82 (a).

We relied on these statutory provisions in *Maguire*, in concluding that the trial court improperly had ordered the defendant to reimburse the plaintiff for $50,000 in attorney's fees. *Maguire* v. *Maguire*, supra, 222 Conn. 45. In our analysis of the statutory language and the relevant case law interpreting the statute, we stated: "[A]mple liquid funds [are] not an absolute litmus test for an award of counsel fees. . . . [T]o award counsel fees to a spouse who had sufficient assets would be justified, if the failure to do so would substantially undermine the other financial awards." (Citation omitted; internal quotation marks omitted.) Id., 44. We then determined that the plaintiff had more than $500,000 in liquid assets at her disposal, that the trial court had made no finding that an award of attorney's fees was necessary to avoid undermining its other financial orders, and that the record did not support such a finding. Id., 44–45. Therefore, we reversed the award of attorney's fees to the plaintiff. Id., 45. Thus, the general rule under *Maguire* is that an award of attorney's fees in a marital dissolution case is warranted only when at least one of two circumstances is present: (1) one party does not have ample liquid assets to pay for attorney's fees; or (2) the failure to award attorney's fees will undermine the court's other financial orders. See id., 44.

Under *Maguire*, in a case such as the present one, in which an innocent party has incurred substantial attorney's fees as a result of the other party's litigation misconduct, the innocent party must nevertheless bear

the full brunt of her attorney's fees, as long as the innocent party has ample liquid funds to pay her attorneys, and as long as the lack of an award of attorney's fees would not undermine the court's other financial orders. This result would follow regardless of the seriousness, duration and pervasiveness of the other party's litigation misconduct, regardless of how high the resultant cost to the innocent party, and regardless of any advantage the wrongdoer may have secured through his litigation misconduct, such as, for example, the successful concealment of a portion of his assets. Significantly, *Maguire* involved no allegations or findings of litigation misconduct. In that decision, therefore, the court did not consider whether one party's attorney's fees resulting from the misconduct of the other party should be recoverable apart from other financial orders.

In a subsequent decision that *did* involve both allegations and findings of litigation misconduct, we implicitly acknowledged that an expansion of *Maguire* would be appropriate. In *Jewett* v. *Jewett*, 265 Conn. 669, 694, 830 A.2d 193 (2003), we sustained an award of attorney's fees that was based, in part at least, on the fact that "much of the plaintiff's accrued or already paid legal fees have been caused by the defendant's failure . . . promptly and candidly [to] comply with numerous motions and discovery." (Internal quotation marks omitted.) Thus, in *Jewett*, we implicitly acknowledged that a party's litigation misconduct can form part of the basis of such an award of attorney's fees.

Our conclusion that a court should have the discretion to award attorney's fees to a party who incurs those fees largely due to the other party's egregious litigation misconduct is consistent with the reasoning of our decision in *Billington* v. *Billington*, supra, 220 Conn. 212. In that case, we explicitly recognized the requirement of full and frank disclosure between marital litigants. Id., 221. We drew that requirement from

our understanding of the unique nature of the marital relationship; id. ("Courts simply should not countenance either party to such a unique human relationship dealing with each other at arms' length. Whatever honesty there may, or should, have been during the marriage should at least be required by the courts at its end." [Internal quotation marks omitted.]); and from the understanding that "the principle of full and frank disclosure . . . is essential to our strong policy that the private settlement of the financial affairs of estranged marital partners is a goal that courts should support rather than undermine." (Internal quotation marks omitted.) Id. Thus, in eliminating the requirement of diligence in order to prove fraud, we stated that "the requirement of diligence in discovering fraud is inconsistent with the requirement of full disclosure because it imposes on the innocent injured party the duty to discover that which the wrongdoer already is legally obligated to disclose." Id., 220. By recognizing today this limited expansion of *Maguire*, we are reinforcing the marital partners' mutual obligation of full and frank disclosure by permitting the trial court an additional remedy for egregious violations of that obligation when those violations have not otherwise been adequately addressed by the court.

Public policy and principles of equity further support our expansion of the *Maguire* rule. Allowing recovery for attorney's fees incurred due to litigation misconduct will discourage the recalcitrant marital litigant from evading his obligations of full and frank disclosure, and will encourage compliance with those obligations. When a marital litigant who does play by the rules has to expend her own funds to pay her attorneys significant amounts of money to enforce discovery orders against, and uncover assets hidden or transferred by, the other marital litigant who is flouting those rules, and when other orders of the court have not adequately addressed

that wrongdoing by one party and harm to the other, it is only fair that the wrongdoer compensate the "innocent injured party [for having] to discover that which the wrongdoer already [was] legally obligated to disclose." Id.

The present case aptly illustrates the need for expanding *Maguire* to allow a trial court the discretion to award attorney's fees to address the litigation misconduct of a marital litigant. The record contains ample evidence of egregious litigation misconduct by the defendant, both before and during the trial, that would form the basis of such an exercise of discretion. The pretrial conduct of the defendant in failing to fulfill his obligations of full and frank disclosure, and of compliance with orders of the court, has been amply discussed in part I of this opinion.[13]

Furthermore, in its memorandum of decision, the court specifically addressed additional pretrial litigation misconduct by the defendant, namely, diversion

[13] As we already have noted, the plaintiff filed multiple motions for contempt and for sanctions for the purpose of obtaining compliance. These consisted of the following motions of the plaintiff and orders of the court: (1) motion for compliance dated October 2, 2000, granted by the court; (2) motion for contempt dated February 5, 2001, for failure to comply with the court's October 2, 2000 order, on which the parties stipulated and the court ordered compliance by the defendant within seven days; (3) a second motion for contempt, dated July 6, 2001, for the defendant's failure to comply with the February 5, 2001 order, and a July 23, 2001 order of the court to the defendant to comply fully within thirty days and to pay the plaintiff $2500 in attorney's fees if the plaintiff determined that he had not fully complied; (4) a third motion for contempt for the defendant's failure to comply with the July 23, 2001 order, and an order by the court for the defendant to pay the plaintiff $25,000 in attorney's fees and an additional $15,000 as a retainer for the costs of future discovery; (5) the defendant's motion to reargue the plaintiff's third motion for contempt, dated February 1, 2002, resulting in an order of discovery mediation with a special master, and an order of the court denying the defendant's motion to reargue and a further order that the defendant comply, within two weeks, with the court's earlier order to pay $2500 in attorney's fees; and (6) the plaintiff's final pretrial motion for contempt, filed August 14, 2002, which the court refused to consider.

of marital assets and concealment thereof from the plaintiff. The court stated that "the evidence supports [the plaintiff's] claim that the [defendant] used *at least* $395,000 in marital assets, including a partial distribution from his Capital Deposit Account ($174,023), a payment of Special Compensation ($208,725), and a joint income tax refund ($12,736), for the purchase of such things as a BMW automobile, an apartment in Düsseldorf, Germany, and to maintain his lifestyle in Europe. He has tried to keep these assets out of reach by placing title in the names of other persons.[14] The [plaintiff] has spent enormous sums [of money] for attorney's fees in large part to trace these assets, with limited success." (Emphasis in original.)

With respect to the defendant's misconduct during the trial, in its decision the court explicitly noted the defendant's pattern of deceit and disdain for the legal process. The court stated that the defendant "is a well educated, very intelligent and sophisticated international professional. However, instead of emphasizing these attributes, he has carried the pattern of deceit right into the courtroom, where, with barely concealed disdain for the legal process, he repeatedly feigned misunderstanding of plain English (the lingua franca of international business dealings), engaged in linguistic gymnastics, and had selective lapses of memory. He had to be repeatedly admonished by the court, and accordingly, the court found him to be less than credible in much of his testimony."

In addition, during the trial, the court several times commented on the defendant's misconduct. For example, at one point the court noted the defendant's "obstructive, obstreperous behavior" on the witness

---

[14] These "other persons" were Landgren and Meyer; the plaintiff testified that the defendant had maintained sexual relations in Europe with both of these women while married to the plaintiff.

stand; at another point the court noted that the defendant was "bound and determined to not listen to the questions. He's going to tell it his way. He doesn't care. He doesn't care what I say, what [his counsel] say[s], what [the plaintiff's counsel] says. He is going to tell it his way because he knows better than everybody in this courtroom. It's wearing very, very thin. . . . And every single answer is like pulling teeth."

As we already have noted, in denying the plaintiff's request for attorney's fees based on the defendant's litigation misconduct, the court correctly interpreted the existing rule under *Maguire* in concluding that it did not have the discretion to consider such an award. In light of our decision today, however, the court will, on the remand, have such discretion. This does not mean, and we do not say, that the court must award such fees. Nor does it mean that the court may award such fees if it determines that the defendant's misconduct adequately has been addressed by other orders of the court. It means only that, when a party has engaged in egregious litigation misconduct that has required the other party to expend significant amounts of money for attorney's fees, and where the court determines, in its discretion, that the misconduct has not been addressed adequately by other orders of the court, the court has discretion to award attorney's fees to compensate for the harm caused by that misconduct, irrespective of whether the other party has ample liquid assets and of whether the lack of such an award would undermine the court's other financial orders.

The defendant and the dissent contend, however, that this expansion of *Maguire*, namely, allowing a trial court the discretion to award attorney's fees incurred by one party as a result of the egregious litigation misconduct of the other party when the court's other financial orders have not adequately addressed that misconduct, amounts to a sanction and violates the

often stated principle that attorney's fees awards are not to be used to penalize parties. See, e.g., *Blake* v. *Blake*, 211 Conn. 485, 488, 560 A.2d 396 (1989) ("[p]unishment of a litigant should play no role in the determination of the issue of awarding attorney's fees"). We disagree. We repeat that the purpose of the expansion of *Maguire* is to compensate an innocent party for having had to bear the burden of expenses incurred as a result of the other party's misconduct. The aim of the expansion is to prevent the innocent party from being unfairly burdened. The fact that the result may also deter the wrongdoer from *benefiting* from his egregious litigation misconduct does not convert an award under the expansion to a sanction. It simply reallocates the burden for the increased fees to the party responsible for causing them.

The sole case cited by the defendant in support of his claim that this expansion of *Maguire* improperly imposes a sanction on parties, *Dobozy* v. *Dobozy*, 241 Conn. 490, 697 A.2d 1117 (1997), is distinguishable. In that case, the issue was "the extent to which . . . § 46b-62 authorizes a trial court, in a contempt proceeding brought to enforce child care and support orders, to award reasonable attorney's fees to the prevailing parent without first finding the respondent parent in contempt." Id., 492. In that case, then, there had been no finding by the trial court that one of the parties engaged in litigation misconduct. The court's inquiry was whether, in the absence of such a conclusion, an award of attorney's fees would nevertheless be justified. We answered that question in the affirmative. Id., 495. In the present case, by contrast, the litigation misconduct of the defendant was established over and over again, each time the court granted the plaintiff's motions for contempt, and again in the trial court's memorandum of decision, which concluded that the defendant's misconduct permeated the entire case. The

characterization, by both the defendant and the dissent, of the expansion we recognize today as a sanction ignores the fact that, in the absence of the expansion, an innocent party would be forced to bear the financial cost for the defendant's misconduct.

The judgment is reversed as to the financial orders only and the case is remanded for a new trial on the financial issues.

In this opinion NORCOTT, KATZ and PALMER, Js., concurred.

ZARELLA, J., with whom VERTEFEUILLE and SULLIVAN, Js., join, dissenting. The majority reverses the trial court's judgment as to the financial orders on the ground that the court improperly failed to rule on a pretrial motion for contempt and sanctions by the plaintiff, Melissa K. Ramin. The majority also expands the rule in *Maguire* v. *Maguire*, 222 Conn. 32, 608 A.2d 79 (1992), to permit an award of attorney's fees for the purpose of compensating a party for the litigation misconduct of the opposing party. I disagree with both of these holdings because the first unwisely interferes with the trial court's broad discretion in the administration and management of discovery matters and the second ignores the applicable statutes, rules of practice and case law that govern an award of attorney's fees. Accordingly, I respectfully dissent.

I

I begin with the plaintiff's motion for contempt and sanctions. The majority concludes, on the basis of *Ahneman* v. *Ahneman*, 243 Conn. 471, 706 A.2d 960 (1998), that in marking the motion off the calendar, the trial court refused to decide the issues raised therein and thus abdicated its fundamental obligation to decide all matters properly placed before it. I disagree.

The following facts are relevant to a resolution of this issue. The plaintiff filed a motion for contempt and sanctions on August 14, 2002, after the defendant, Kurt P. Ramin, failed to comply with the court's most recent discovery order. In her motion, the plaintiff asked the court to: (1) hold the defendant in contempt for his noncompliance with discovery; (2) order the defendant to produce all outstanding documents within one week or appear in court to show cause why he should not be incarcerated for wilful contempt; and (3) order the defendant to pay sanctions to the plaintiff and her reasonable attorney's fees. On September 9, 2002, after hearing argument on the matter, the trial court, clearly exasperated by the parties' continuing battle over discovery, declared that it was not inclined to decide the motion at that time. The court stated: "Take your depositions, see where you go. *If there's something very, very specific as far as the discovery is concerned, I mean specific and vital, major case, following the deposition, then I'll hear you on it . . . .*" (Emphasis added.) The plaintiff did not object to the trial court's decision. Thereafter, the court marked the motion off the calendar, the plaintiff deposed the defendant over the course of five days in October and December, 2002, and the parties proceeded to trial in March, 2003.

At the commencement of the trial, the plaintiff filed a motion in limine requesting that "certain financial matters regarding which discovery was sought from the [d]efendant and with regard to which he failed and refused to comply, shall be established for the purposes of the action in accordance with the claims of the [p]laintiff." The financial matters to which the motion referred included assets that the defendant had identified during his deposition, including funds that he had transferred to his girlfriend in Germany and a $70,000 retirement account that he had maintained in the United Kingdom. The motion also sought to preclude the defen-

dant, pursuant to Practice Book § 13-14, from offering testimony or documents to rebut the plaintiff's claims concerning these and other assets that the defendant had placed outside the marital estate or deliberately had concealed from the plaintiff and the court.

In explaining her reasons for filing the motion, the plaintiff's counsel observed that, during the September 9 hearing, the court had "grown quite understandably frustrated with the discovery process and *requested that we try and address it all at the time of trial.*" (Emphasis added.) She then described the defendant's continuing refusal to cooperate during his five day deposition and his noncompliance with her requests for the production of documents. When the court asked the plaintiff's counsel how she wanted the court to deal with the defendant's ongoing discovery misconduct, she asked that it grant the motion in limine, stating: "[T]hat would seem to me to be the perfectly appropriate resolution." She also requested attorney's fees to sanction the defendant for the additional legal expenses incurred to obtain the information he had refused to produce.

The court responded that it would consider specific evidence regarding the dissipated assets on a case-by-case basis as it was introduced at trial, rather than granting the motion in limine at that time. The court also agreed to consider the plaintiff's request for attorney's fees to sanction the defendant for his noncompliance with discovery. The plaintiff's counsel expressed satisfaction with the court's response and declared that she was prepared to try the case.

Thereafter, the plaintiff requested on two separate occasions that sanctions be imposed against the defendant. On the first occasion, the defendant testified on direct examination that he had transferred approximately $194,000 out of the marital estate to his German girlfriend, Martina Meyer, without the plaintiff's consent

following commencement of the dissolution proceedings. In denying the plaintiff's motion, the court explained that the defendant had stated that he did not intend to introduce any additional evidence contradicting his former testimony on the matter, and, consequently, improper removal of the assets in question was an "*uncontroverted*" fact that the court would take into account when making an equitable distribution of the marital estate at the conclusion of the trial. (Emphasis added.)

On the second occasion, the court granted the plaintiff's motion for sanctions with respect to the defendant's proposed testimony on cross-examination regarding his removal of an additional $177,248 out of the marital estate without the plaintiff's knowledge or consent. The court explained: "I'm specifically tying [this decision] into the original motion in limine and I'm specifically tying it into [the defendant's] responses and his behavior and what this court deems to be a calculated . . . effort to obstruct the discovery process and to move this case forward." In its subsequent memorandum of decision, the court also explained that it had considered the defendant's noncompliance with discovery when it formulated the financial orders distributing the marital estate.

Practice Book § 11-13 provides in relevant part: "(a) Unless otherwise provided in these rules or ordered by the judicial authority . . . all motions and objections to requests when practicable . . . must be placed on the short calendar list. . . . [A]ny motion in a case on trial, or assigned for trial, may be disposed of by the judicial authority *at its discretion* . . . . (c) If a motion has gone off the short calendar without being adjudicated any party may claim the motion for adjudication. . . ." (Emphasis added.) Accordingly, the issue before

this court is whether the trial court abused its discretion when it marked the plaintiff's motion off the calendar.[1]

"As with any discretionary action of the trial court, appellate review requires every reasonable presumption in favor of the action, and *the ultimate issue for us is whether the trial court could have reasonably concluded as it did.* . . . In reviewing a claim that the court has abused this discretion, great weight is due to the action of the trial court and every reasonable presumption should be given in favor of its correctness . . . .

"At the same time . . . [d]iscretion imports something more than leeway in decision-making. . . . It means a legal discretion, to be exercised in conformity with the spirit of the law and in a manner to subserve and not to impede or defeat the ends of substantial justice. . . . [T]he court's discretion should be exercised mindful of the policy preference to bring about a trial on the merits of a dispute whenever possible and to secure for the litigant his day in court. . . . The design of the rules of practice is both to facilitate business and to advance justice; they will be interpreted liberally in any case where it shall be manifest that a strict adherence to them will work surprise or injustice.

---

[1] I disagree with the majority that the issue in this case is not whether the trial court abused its discretion, but "whether a trial court has the discretion to refuse to consider a party's motion for contempt." In *Ahneman* v. *Ahneman,* supra, 243 Conn. 484–85, we declared that the trial court is duty bound to consider all matters brought before it *except* in "extreme, compelling situation[s]," or "other circumstances . . . ." Consequently, a trial court must exercise its discretion in determining whether the circumstances in any given case fall within one of the identified exceptions. See id. (court has "*discretion* to refuse to entertain or decide motions in order to prevent harassing or vexatious litigation . . . [or in] other circumstances" [citations omitted; emphasis added]). In reformulating the issue in the manner described, the majority avoids direct consideration of the question raised by the plaintiff on appeal, namely, whether the trial court abused its discretion when it marked the motion "off," and fails to apply the proper legal principles in its subsequent analysis.

. . . Rules are a means to justice, and not an end in themselves . . . ." (Citations omitted; emphasis added; internal quotation marks omitted.) *Millbrook Owners Assn., Inc.* v. *Hamilton Standard*, 257 Conn. 1, 15–16, 776 A.2d 1115 (2001).

The trial court in the present case did not refuse to consider the plaintiff's motion for contempt and sanctions, but, rather, conducted a hearing on September 9, 2002, for that very purpose. At the conclusion of the hearing, the court chose, in the reasonable exercise of its discretion pursuant to our rules of practice; see Practice Book § 11-13; to mark the motion off the calendar. The court advised the plaintiff that it would hear the parties further with respect to any "specific and vital" discovery information that the plaintiff failed to obtain when she deposed the defendant the following month. As a result, the trial court's decision was the functional equivalent of denying the plaintiff's motion without prejudice because the court, having concluded that the motion should not be decided at that time, effectively "[left] the matter open for further presentation and consideration in the same or another proceeding."[2] *Varanelli* v. *Luddy*, 130 Conn. 74, 80, 32 A.2d 61 (1943).

It is the duty of the reviewing court to make every reasonable presumption in favor of the trial court's ruling. See *Millbrook Owners Assn., Inc.* v. *Hamilton Standard*, supra, 257 Conn. 15. I would therefore conclude, mindful that the rules of practice are designed to facilitate business and advance justice, that the trial

[2] Although the court stated that it would be open to hearing further argument only with respect to "specific and vital" information that the defendant failed to produce at his deposition, the court in fact granted the plaintiff discretion to request a hearing as to any or all of the discovery materials she sought in her motion, as long as she deemed them "vital" to her case. The ruling thus did not limit the plaintiff's ability to seek further discovery with respect to any of the materials identified in her motion.

court properly and reasonably exercised its discretion by deferring to rule on the motion for contempt and sanctions until after the plaintiff had made one final attempt to obtain discovery during the defendant's deposition. Significantly, the plaintiff did not object to the trial court's decision when it was rendered or at any time thereafter. Moreover, after the defendant produced some of the requested documents during the deposition, the plaintiff chose not to seek further argument on the contempt motion, as she could have done, but instead filed a motion in limine requesting that the court impose sanctions at trial for the defendant's remaining discovery misconduct. At the hearing on that motion, the plaintiff indicated that the reason she had not resurrected her prior motion was because the trial court had *"requested that we try and address [the remaining discovery issues] at the time of trial,"* which she later described as a *"perfectly appropriate resolution"* of the matter. (Emphasis added.) Furthermore, the plaintiff received the relief she sought in her motion in limine on the only two occasions when she objected to the defendant's actual or proposed testimony regarding the allegedly dissipated assets.[3] As a result, the plaintiff achieved her objective of ensuring that the court accept her version of events as true on both occasions. Notably, the plaintiff did not merely acquiesce in the solution devised by the court to address the defendant's discovery abuse, but participated in crafting it when she filed the motion in limine at the commencement of the trial. Accordingly, I would conclude that the court did not abuse its discretion when it deferred consideration of the plaintiff's motion until after the defendant's deposition.

---

[3] The court denied the plaintiff's first request for sanctions as unnecessary because the defendant did not intend to contradict the damaging testimony. Consequently, the court stated that it would accept the evidence regarding the defendant's transfer of assets out of the marital estate as an *"uncontroverted"* fact. (Emphasis added.)

To the extent that the majority construes the trial court's failure to render a formal ruling on the motion as an absolute refusal to consider the issues raised therein, I submit that the plaintiff herself would not have agreed with this conclusion. If she had believed that the court's decision amounted to an absolute refusal, she could have claimed the motion or sought its reassignment to another judge pursuant to Practice Book §§ 11-13 and 11-19.[4] Indeed, her subsequent remarks at the hearing on the motion in limine indicate that she was satisfied with the trial court's decision to defer a ruling on the motion and to address all remaining discovery issues at trial. The majority's failure to view as significant the fact that the plaintiff did not renew her request for sanctions following the defendant's deposition, claim her motion, or seek reassignment of the motion to another judge, suggests an unwillingness to hold the plaintiff and her attorney accountable for their decisions regarding how to deal with the defendant's discovery misconduct prior to and during the trial. I believe that micromanaging the trial court in

[4] Practice Book § 11-19 provides: "(a) Any judge of the superior court and any judge trial referee to whom a short calendar matter has been submitted for decision, with or without oral argument, shall issue a decision on such matter not later than 120 days from the date of such submission, unless such time limit is waived by the parties. In the event that the judge or referee conducts a hearing on the matter and/or the parties file briefs concerning it, the date of submission for purposes of this section shall be the date the matter is heard or the date the last brief ordered by the court is filed, whichever occurs later. If a decision is not rendered within this period the matter may be claimed in accordance with subsection (b) for assignment to another judge or referee.

"(b) A party seeking to invoke the provisions of this section shall not later than fourteen days after the expiration of the 120 day period file with the clerk a motion for reassignment of the undecided short calendar matter which shall set forth the date of submission of the short calendar matter, the name of the judge or referee to whom it was submitted, that a timely decision on the matter has not been rendered, and whether or not oral argument is requested or testimony is required. The failure of a party to file a timely motion for reassignment shall be deemed a waiver by that party of the 120 day time."

matters of discovery, as the majority appears to do here, *especially* in emotionally tense family disputes, is dangerous and unwarranted.

The majority maintains that our decision in *Ahneman* compels a different result. I emphatically disagree on the ground that *Ahneman* is factually distinguishable. In that case, the defendant filed several postjudgment motions concerning financial and nonfinancial matters. *Ahneman* v. *Ahneman*, supra, 243 Conn. 474. At short calendar, the trial court rendered an oral decision declining to consider the motions. Id., 475. Thereafter, the defendant moved for reconsideration and reargument. Id., 475–76. Following reargument, the court announced that it would consider the motions concerning nonfinancial matters, but would not consider the motions regarding financial matters. Id., 476. The court explained: "As far as the money issues are concerned, it was my opinion that that was the law of the case that was established by the contested hearing we had over the modification and the contempt. That ruling, I think, would cover these other money issues. . . . I will not hear anything on monetary aspects because I think the law of the case was established as a result of the earlier hearing. It's now on appeal. The nonmonetary aspects I will set down for a hearing . . . ." (Internal quotation marks omitted.) Id., 476–77 n.7.

On appeal to this court, we initially determined that we had jurisdiction to review the defendant's claim because the trial court's "decision not to consider the defendant's motions" was the functional equivalent of a final judgment. Id., 480. We stated that, "[l]ike a formal denial, the effect of the court's decision refusing to consider the defendant's motions during the pendency of the appeal was to foreclose the possibility of relief from the court on those issues, unless and until the resolution of the appeal required further proceedings. Indeed, the refusal to consider a motion is more deserv-

ing of appellate review than a formal denial, because the defendant not only has been denied relief; she has been denied the opportunity even to persuade the trial court that she is entitled to that relief. Moreover . . . there is an unacceptable possibility that any harm suffered as a result of the court's refusal to consider the motion will never be remediable." Id.

We then considered whether the trial court had discretion to refuse to consider the motions and concluded that it did not. We stated that, "where a court is vested with jurisdiction over the subject-matter . . . and . . . obtains jurisdiction of the person, it becomes its . . . duty to determine every question which may arise in the cause . . . . [A] trial court must consider and decide on a reasonably prompt basis all motions properly placed before it [except] in an extreme, compelling situation," such as "to prevent harassing or vexatious litigation" or in "other [undefined] circumstances . . . ." (Citation omitted; internal quotation marks omitted.) Id., 484–85. We ultimately determined that no extenuating circumstances existed in *Ahneman* that would have justified the trial court's refusal to consider the disputed motions. Id., 485.

The present case is distinguishable from *Ahneman* because the trial court's decision to mark the motion off the short calendar was *not* a final judgment that foreclosed the possibility of relief or that denied the plaintiff an opportunity to persuade the court that she was entitled to such relief. Unlike in *Ahneman*, the court in the present case exercised its jurisdiction when it conducted a hearing on the merits of the plaintiff's motion, listened to the parties' arguments and advised the plaintiff at the conclusion of the hearing that she could seek future relief if the defendant did not comply with her requests for discovery during his deposition. When the defendant persisted in his misconduct by failing to cooperate fully at his deposition, the plaintiff

filed a motion in limine at the start of the trial requesting an order that certain disputed financial matters be established in accordance with her claims and that the defendant be precluded from presenting contradictory evidence. Furthermore, the plaintiff ultimately obtained the relief she requested. Accordingly, the facts in *Ahneman*, in which the court did *not* exercise its jurisdiction because the issues raised in the defendant's motion had been raised in her pending appeal and would be decided by the reviewing court, are completely different from the facts in the present case. The majority's reliance on *Ahneman* as a basis for reversal is, therefore, misplaced.

I also disagree with the majority's conclusion that the burden of establishing harm should be shifted from the plaintiff to the defendant "under the unique circumstances of this case . . . ." See *Bovat* v. *Waterbury*, 258 Conn. 574, 594, 783 A.2d 1001 (2001) ("[i]n order to establish reversible error, the defendant must prove both an abuse of discretion and a harm that resulted from such abuse"). According to the majority, the circumstances in this case are "unique" because of the defendant's offensive behavior during his deposition. He was disrespectful and defiant, threw his wallet at the plaintiff's counsel when she asked him to produce his credit cards, repeatedly used obscenities and read a magazine during the proceeding. I would submit, however, that the defendant's behavior at the deposition was irrelevant to the issue of harm because it occurred *after* the trial court's consideration of the motion for contempt and sanctions, and, consequently, had no connection to the court's prior action.[5] Moreover, the defendant's bad behavior during the deposition had no

[5] This contrasts with the plaintiff's subsequent motion in limine, which she filed in response to the court's prior declaration that it would consider all remaining "specific" and "vital" discovery issues following the defendant's deposition.

connection to his noncompliance with discovery. In other words, although I agree with the majority that the defendant acted in a provocative and aggressive manner during his deposition, any harm that may have been caused by his failure to comply with discovery would have occurred even if he had not behaved offensively. I therefore disagree that the "unique" circumstances in this case warrant shifting the burden to prove harm from the plaintiff to the defendant.

The majority provides two additional reasons for imposing such a requirement. The first is that it would be unfair to ask the plaintiff to demonstrate how she was harmed when she did not have access to important discovery materials, not identified by the majority, as a result of the court's decision to mark her motion "off." As previously discussed, however, the plaintiff had very specific reasons for seeking certain documents and was quite capable of explaining why the lack of that information would prevent her from making a more persuasive case against the defendant. In addition, the court did *not* rule that the plaintiff could not seek future relief as to the discovery materials described in her motion, such as the documents cited by the majority pertaining to the defendant's $450,000 promissory note to Theodora Landgren. Indeed, such materials were *exactly* the type of information to which the court referred when it said that it would be willing to entertain a future hearing on the motion. Moreover, it was the plaintiff who decided not to seek another hearing on the motion following the defendant's deposition, despite the invitation from the court, and it was the plaintiff who stated at trial that the sanctions she sought, and ultimately obtained, against the defendant constituted a "perfectly appropriate resolution" of the parties continuing discovery dispute. In sum, the majority's conclusion that our long held standard for proving harm should be

altered *in this one particular instance* is simply unwarranted.

The majority also justifies placing the burden to prove a lack of harm on the defendant by explaining that it is consistent with our reasoning in *Billington* v. *Billington*, 220 Conn. 212, 221, 595 A.2d 1377 (1991). I disagree. The majority states that *Billington* applies because, in that case, "we analogized the marital relationship, even in the context of a dissolution case, to the special relationship between fiduciary and beneficiary, insofar as the requirement of disclosure is concerned." (Internal quotation marks omitted.) The majority then declares: "[J]ust as, once it has been shown that a fiduciary has engaged in self-dealing, he has the burden to establish the fairness of the transaction by clear and convincing evidence; see *Cadle Co.* v. *D'Addario*, 268 Conn. 441, 457, 844 A.2d 836 (2004); so, as in the present case, when the defendant has breached his fiduciary-like obligations of discovery to the plaintiff as ordered by the court, he should bear the burden of establishing that his breach of that obligation did not harm the beneficiary of that obligation." This argument can only be described as specious.

The quoted passage from *Billington* declares: "We have recognized . . . in the context of an action based upon fraud, that the special relationship between fiduciary and beneficiary compels full disclosure . . . . *Although marital parties are not necessarily in the relationship of fiduciary to beneficiary, we believe that no less disclosure is required* of such parties when they come to court seeking to terminate their marriage." (Emphasis added.) *Billington* v. *Billington*, supra, 220 Conn. 221. The point made in the foregoing passage is that the parties in a dissolution proceeding are in a relationship similar to, although not the same as, that of a fiduciary and beneficiary and, accordingly, they are obligated to make "full disclosure" of their assets,

nothing more. For the majority to rely on *Billington* as support for shifting the burden of proof from the plaintiff to the defendant for noncompliance with discovery requires a leap in logic that finds no support whatsoever in that case. In fact, the majority cites *no* marital dissolution case in which this court considered a discovery claim and suggested that the burden of proof should be shifted to the noncomplying party to prove a lack of harm. For all of the foregoing reasons, I am compelled to disagree with the majority's conclusion that the trial court's decision to mark the plaintiff's motion "off" the calendar requires reversal of the financial orders.

## II

The majority next concludes that the rule articulated in *Maguire* should be expanded to grant the trial court discretion to award attorney's fees as part of the financial orders when a party has incurred substantial legal expenses because of the other party's litigation misconduct and "the other orders of the court have not already adequately addressed that misconduct." I disagree with this holding because it is inconsistent with the governing statutes, fails to recognize the numerous remedial provisions in our rules of practice that permit an award of attorney's fees as a sanction for discovery misconduct, and misapplies our well established case law on the matter.

The underlying premise of the majority's holding is that other means may be inadequate to compensate a party for the legal expenses incurred because of the other party's discovery misconduct, even when the financial orders leave the "innocent" party with sufficient liquid assets to pay such expenses without disturbing the trial court's other financial orders. The majority inexplicably fails, however, to examine the rules of practice specifically designed to compensate an "innocent" party when the other party abuses the

discovery process. For example, the abusing party may be subject to sanctions, discovery orders compensating the "innocent" party for reasonable attorney's fees and costs, and orders that facts regarding the discovery sought will be taken as established in accordance with the claim of the party seeking discovery. Similarly, parties who conceal or dissipate assets may be subject to financial orders that take the alleged misconduct into account. The majority ignores the fact that the trial court in the present case employed *all four techniques* to discipline the defendant for his bad behavior.

Practice Book § 13-14 provides in relevant part: "(a) If any party has failed to answer interrogatories or to answer them fairly, or has intentionally answered them falsely or in a manner calculated to mislead, or has failed to respond to requests for production . . . or has failed to comply with a discovery order made pursuant to Section 13-13, or has failed to comply with the provisions of Section 13-15, or has failed to appear and testify at a deposition duly noticed pursuant to this chapter, or has failed otherwise substantially to comply with any other discovery order made pursuant to Sections 13-6 through 13-11, the judicial authority may, on motion, make such order as the ends of justice require. (b) Such orders may include the following: (1) The entry of a nonsuit or default against the party failing to comply; (2) *The award to the discovering party of the costs of the motion, including a reasonable attorney's fee*; (3) The entry of an order that the matters regarding which the discovery was sought or other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order; (4) The entry of an order prohibiting the party who has failed to comply from introducing designated matters in evidence; (5) If the party failing to comply is the plaintiff, the entry of a judgment of dismissal. . . ." (Emphasis added.) The

majority fails to address why this comprehensive array of techniques is insufficient to address adequately non-compliance with discovery orders by a party who has incurred substantial legal expenses as a result of the other party's misconduct.

"[A] court may, either under its inherent power to impose sanctions in order to compel observance of its rules and orders, or under the provisions of § 13-14, impose sanctions . . . ." *Millbrook Owners Assn., Inc.* v. *Hamilton Standard*, supra, 257 Conn. 14. In the present case, the court imposed $42,500 in attorney's fees and sanctions on the defendant for his lack of cooperation during discovery, describing them as "the largest sanctions I have issued in my two and a half years on the bench . . . ." *The plaintiff did not appeal from those orders or claim that they were insufficient compensation* for the additional time and effort expended by her attorneys to obtain the information she was seeking.

The court also granted the plaintiff's motion in limine, thereby accepting as an established fact for purposes of the action that the defendant improperly had transferred approximately $177,000 out of the marital estate to his girlfriend in Germany. Furthermore, General Statutes § 46b-81 (c) directs the court to "consider the . . . liabilities and needs of each of the parties" in fixing the nature and value of the property to be assigned. Among the liabilities and needs of the plaintiff were the extraordinary legal expenses she incurred during discovery to unearth marital assets that the defendant had refused to disclose. Although the trial court was not required to make a finding on this issue; see *Weiman* v. *Weiman*, 188 Conn. 232, 234, 449 A.2d 151 (1982); the record establishes that it considered the defendant's misconduct as well as the plaintiff's depletion of her inheritance to discover the concealed assets when it fashioned its financial orders.

In its memorandum of decision, the court noted that the defendant had used "*at least* $395,000 in marital assets" for his own benefit and that the plaintiff had "spent enormous sums for attorney's fees, in large part to trace these assets, with limited success." (Emphasis in original.) The court also stated that, in dividing the parties' property, it would be "equitable and appropriate" to take into account the defendant's unauthorized disposition of $382,725 of the marital assets by giving the plaintiff a share of other assets as an offset. Finally, the court acknowledged in its articulation that, in formulating its financial orders, it had considered evidence introduced by the plaintiff at trial that the defendant had engaged in a " 'pattern of deceit.' " Thus, the court considered the evidence introduced by the plaintiff that the defendant allegedly had dissipated or wrongfully concealed marital assets that, from the trial court's opinion and articulation, amounted to more than $900,000, and were distributed by the court so that the plaintiff received approximately 58.5 percent of the parties' total financial assets and the defendant received approximately 41.5 percent. Accordingly, there is no need to expand the rule in *Maguire* because, as the present case amply demonstrates, the court has other methods at its disposal to compensate the "innocent" party.

In addition, the statutory scheme does not permit an expansion of *Maguire* in the manner suggested by the majority. General Statutes § 46b-62 governs the trial court's award of attorney's fees in a dissolution proceeding and provides in relevant part: "[T]he court may order either spouse . . . to pay the reasonable attorney's fees of the other *in accordance with their respective financial abilities* and the criteria set forth in [General Statutes §] 46b-82." (Emphasis added.) The criteria set forth in § 46b-82 (a) are "the length of the marriage, the causes for the annulment, dissolution of

the marriage or legal separation, the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate and needs of each of the parties and the award, if any, which the court may make pursuant to [§] 46b-81 . . . ."[6] When a party has sufficient liquid assets to pay his or her own attorney's fees without undermining the other financial orders, the court has considered that party financially able to pay their own expenses. When a party does *not* have sufficient liquid assets to pay their own legal expenses without undermining the other financial orders, the court has not hesitated to award attorney's fees to compensate the "innocent" party for the other party's misconduct. See *Jewett* v. *Jewett*, 265 Conn. 669, 694, 830 A.2d 193 (2003) (trial court properly awarded attorney's fees to plaintiff where defendant's failure to comply with discovery caused plaintiff to incur substantial legal fees and plaintiff was awarded primarily nonliquid assets); *Bee* v. *Bee*, 79 Conn. App. 783, 791–92, 831 A.2d 833 (trial court properly awarded attorney's fees to plaintiff where defendant dissipated plaintiff's substantial liquid assets and failure to award fees would have undermined orders seeking to achieve equal distribution of marital property), cert. denied, 266 Conn. 932, 837 A.2d 805 (2003). In fact, we have recognized in these circumstances that "the length of the proceedings and the time expended by counsel" are relevant considerations when determining the amount of such an award; *Burton* v. *Burton*, 189 Conn. 129, 142–43 n.16, 454 A.2d 1282 (1983); as are "the nature, complexity and scope of the litigation . . . ." Id., 143. In *Jewett* v.

---

[6] General Statutes § 46b-81 (c) provides in relevant part: "In fixing the nature and value of the property, if any, to be assigned, the court . . . shall consider the length of the marriage, the causes for the annulment, dissolution of the marriage or legal separation, the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities and needs of each of the parties and the opportunity of each for future acquisition of capital assets and income. . . ."

*Jewett,* supra, 694, we specifically recognized that "much of the plaintiff's accrued or already paid legal fees have been caused by the defendant's failure . . . promptly and candidly [to] comply with numerous motions and discovery." (Internal quotation marks omitted.) The majority takes the court's remarks in *Jewett* out of context, however, and does not explain that the court awarded attorney's fees because the defendant had converted most of his assets to cash, whereas the plaintiff, having been awarded primarily nonliquid assets, did not have sufficient liquid assets to pay her own attorney's fees without upsetting the balance achieved by the court's other financial orders. Id. An award of attorney's fees, therefore, was consistent with the provision in the statutory scheme that permits a court to order either spouse "to pay the reasonable attorney's fees of the other *in accordance with their respective financial abilities* . . . ." (Emphasis added.) General Statutes § 46b-62. When, on the other hand, the parties have sufficient liquid assets to pay their own attorney's fees without disturbing the balance created by the other financial orders, each party must be deemed financially capable of paying his or her own legal expenses and an award of attorney's fees to punish the offending party is unwarranted under the statutory scheme.

Indeed, an award of attorney's fees to an "innocent" party, as suggested by the majority, would be inconsistent with the original justification for permitting such an award. In *Steinmann* v. *Steinmann,* 121 Conn. 498, 505, 186 A. 501 (1936), we stated that the purpose of awarding attorney's fees was to ensure that the wife would "not be deprived of her rights because she lacks funds which may be supplied from property in which as a wife she has a real interest but which is usually within the control of the husband. *If, however, she possesses property of her own sufficient to pay the*

*expenses of the suit and available for that use, she is not ordinarily entitled to an allowance.*" (Emphasis added.) An award of attorney's fees in these circumstances would border on punishment, and we have declared, unequivocally, that "[*p*]*unishment of a litigant should play no role in the determination of the issue of awarding attorneys' fees.*" (Emphasis added.) *Blake* v. *Blake,* 211 Conn. 485, 488, 560 A.2d 396 (1989); see also *Foster* v. *Foster,* 84 Conn. App. 311, 324–25, 853 A.2d 588 (2004) (court abused discretion in awarding attorney's fees to defendant because award not based on financial abilities of parties and served to punish plaintiff for chronic interference with defendant's and grandparents' visitation and for disrespect of trial court's orders throughout postjudgment proceedings).

The majority's insistence that an award of attorney's fees to compensate the "innocent" party for the other party's discovery misconduct is not punishment and does not amount to a sanction, but merely prevents the "innocent" party from being "unfairly burdened," cannot sugarcoat or change the fact that an award of this nature is punitive in effect. The plaintiff herself described it as such at the hearing on her motion in limine, when she explained to the court: "I am going to ask the court for two sanctions, and one of them is going to come as part of our proposed orders. And that's that the defendant pay dollar for dollar [the plaintiff's] fees because had he not acted in as obstreperous a fashion as he had, this case would have been over and this case would have been done for far less attorney time, effort, and waste of [the plaintiff's] money." The majority's attempt to portray an award of attorney's fees for discovery misconduct by the other party as less than punitive is simply disingenuous.[7]

---

[7] Because I view such an award as punitive, I also note that it makes no sense to award attorney's fees in the manner suggested if one of the purposes is to deter future misconduct, because the consequences suffered by the offending party, if any, are not imposed until long after the egregious behavior has occurred. Also militating against an award of attorney's fees at the

In sum, I believe that there is no need to expand the rule articulated in *Maguire* because the rules of practice provide the court with many other tools to compensate the "innocent" party for the financial burden incurred as a result of the other party's misconduct. I agree with the majority that the conduct of the defendant in the present case was abhorrent and that his abusive behavior required the court to take appropriate action. I part company with the majority, however, when they suggest that our existing rules are inadequate and that the court failed or refused to employ them when it had the opportunity and obligation to do so. I would argue, to the contrary, that any suggestion that the court did *not* sanction the defendant for his discovery misconduct during the proceedings or account for his misconduct when fashioning its financial orders finds no support in the record. I would thus conclude that the trial court is not permitted by statute to make an award of attorney's fees in its financial orders to punish a noncomplying party, that existing remedies are adequate to address significant discovery abuse and that parties subject to such abuse have a responsibility to exercise their right to obtain relief pursuant to those remedies, as the plaintiff did when she sought and received both monetary and nonmonetary sanctions against the defendant and obtained financial orders that took his discovery misconduct into account. For all of these reasons, I disagree with the majority that the rule in *Maguire* should be expanded.

---

end of the trial to sanction the offending party is that the presiding judge may not have been present when the misconduct occurred, and thus would have no firsthand knowledge of its effect upon the proceedings. Consequently, the court might reject a legitimate request for attorney's fees or reduce the size of such an award to the "innocent" party. Finally, simple logic suggests that sanctions like those provided in § 13-14 of our rules of practice, because they are imposed close in time to the alleged misconduct, are far more likely to have a deterrent effect upon the transgressor and promote appropriate conduct by the parties.