******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

NORA LYNNE VALENTINE *v.* JOEL
ROBERT VALENTINE
(AC 37286)

Keller, Mullins and Lavery, Js.

*Argued November 18, 2015—officially released April 5, 2016*

(Appeal from Superior Court, judicial district of
Middlesex, Regional Family Trial Docket at
Middletown, Pinkus, J.)

*John F. Morris*, for the appellant (plaintiff).

*Joel R. Valentine*, self-represented, the appellee
(defendant).

*Opinion*

KELLER, J. The plaintiff, Nora Valentine, appeals from the judgment of the trial court, rendered following proceedings that occurred in accordance with a remand order of this court, in which it entered financial orders in the parties' dissolution action. The plaintiff claims that the trial court erred: (1) in fashioning its orders regarding the ownership, refinance, and sale of the marital home; (2) in basing its alimony and child support orders on gross, rather than net income; and (3) in retroactively modifying prior court orders for mortgage arrearages and fines for noncompliance with discovery by the defendant, Joel Valentine. We reverse the judgment of the trial court, in part, with respect to the plaintiff's third claim relative to fines that possibly had accumulated for the defendant's noncompliance with discovery. We affirm the judgment in all other respects.

The following facts and procedural history are relevant to this appeal. The parties to this matter were married on July 8, 1990, in Malibu, California. They had two children during their marriage, born on December 21, 1995, and on May 3, 2003. The parties originally tried the issues before the court, *Gould, J.*, and a judgment dissolving their marriage entered on May 20, 2013.[1] This court reversed Judge Gould's judgment in 2014, and remanded this matter for a new trial on all financial issues. *Valentine* v. *Valentine*, 149 Conn. App. 799, 808, 90 A.3d 300 (2014).

On remand, the court, *Pinkus, J.*, conducted a trial on all financial issues over the course of four days, beginning on September 9, 2014, and concluding on September 16, 2014. In its memorandum of decision of September 26, 2014, the court set forth the following findings of fact. "The parties resided in California from the time of the marriage until 2004. The plaintiff was a screen writer with limited success.[2] The defendant was a sound effects designer. In addition, the parties attempted to develop websites and online content. These ventures were not very profitable. The parties relied primarily on the defendant's income. All of their earnings were either deposited into their joint accounts or a corporate account, to which they both had access.

"The parties moved to Connecticut in 2004 and bought their current residence shortly thereafter. They paid $440,000 for the house, which included at least two rental units. They used $100,000 in savings and a $10,000 gift from the plaintiff's grandmother as a down payment. The balance was by way of a bank loan secured by a mortgage. The house is currently assessed at $330,000, with an appraised value of $476,000 by the Woodstock [tax] assessor. The current mortgage balance is listed as $330,000 on the plaintiff's financial affidavit. The mortgage is currently subject to a modification due to a delinquency. The plaintiff pays interest

only for the next several years and has a balloon payment of $76,000 due in 2035.

"While living in Connecticut, the defendant continued to provide services as a sound effects designer and during periods without work utilized savings and an inheritance from his father to pay bills. The plaintiff pursued various ventures including unsuccessfully running for first selectman of Woodstock, editing online content, and speaking at conferences. Little if any income was derived from these sources. In 2011, the defendant obtained his current employment at Lane Construction Company. In 2013, he earned a gross [income] of $75,135 from Lane Construction. He also worked briefly as a [limousine] driver. The plaintiff derives her income from the rental units and by boarding students from . . . Woodstock Academy. Although she has not filed income tax returns for 2011, 2012 and 2013, it appears that she can earn at least $30,000 annually from these sources. In addition, she is applying for jobs and should be able to earn at least minimum wage for a thirty-five hour week for an additional $15,000 annually.

\* \* \*

"The plaintiff accused the defendant of being abusive. The defendant accused the plaintiff of being unfaithful. There is no support for either of these allegations and the court does not find either party more responsible than the other in the breakdown of the marriage.

"The plaintiff started this action on September 27, 2011. Immediately prior to the commencement of the action, the plaintiff removed at least $10,000 from various accounts. The plaintiff also removed the china, silver, and her personal jewelry from the family home. The plaintiff returned to her mother a 1958 Corvette that had been in the [parties'] possession for a few years, without the defendant's permission. The plaintiff also returned to her mother deeds to property that had not been recorded. The plaintiff removed items of furniture from storage and had them transported out of state without the defendant's permission. The defendant removed the plaintiff's name from some accounts, changed the beneficiary on his life insurance to his sister, and did not keep the bills current." (Footnote added.)

The court issued new financial orders after indicating that it had considered the testimony and exhibits presented at trial, the statutory criteria pertaining to property division and awards of alimony and child support as expressed in General Statutes §§ 46b-81, 46b-82, and 46b-84, as well as other pertinent statutes, including the child support and arrearage guidelines regulations.

The court ordered the defendant to pay $300 per week in child support for the parties' two children to the plaintiff, retroactive to May 20, 2013, in accordance

with the child support guidelines. This amount was to be adjusted to $215 per week effective June 27, 2014, when the defendant was obligated to pay child support for only one child. The court found that the defendant had "an arrearage for pendente lite support in the amount of $928, which shall be paid at the rate of $10 per week." The court also ordered that "[f]rom the date of judgment, the parties shall be equally responsible for the minor children's extracurricular activities, provided that they are agreed to in advance by the parties in writing, which agreement shall not be unreasonably withheld . . . [but that n]either shall be responsible for more than $1250 per year [for such] expenses." The court ordered that the defendant would "be responsible for the children's health insurance, for so long as they are eligible, provided it is available to him through his employer at reasonable expense." Further, the court ordered that "[u]nreimbursed medical and dental expenses for the minor children shall be paid 46 percent by the plaintiff and 54 percent by the defendant." The court retained "jurisdiction for educational support of the party's children pursuant to General Statutes § 46b-56c," but it did not enter a current order because there was no evidence that the requirements of § 46b-56c (d) and (e) had been met.

With respect to the marital home, the plaintiff was awarded all right, title and interest in that property. She was ordered to be solely responsible for the mortgage, taxes, insurance, and all other expenses related to the home. She also was ordered to "attempt to remove the defendant from any obligation due on the mortgage on at least an annual basis, and if not accomplished within eight years of the date of [the] judgment, [she would be ordered] to immediately place the property for sale." Further, the court ordered that "[a]ny proceeds realized from [such a] sale shall belong to the plaintiff."

The defendant was ordered to pay $250 per week in alimony to the plaintiff, retroactive to May 20, 2013.[3] This alimony obligation is modifiable and will terminate only upon the death of either party, the remarriage of the plaintiff, or, pursuant to General Statutes § 46b-86 (b), cohabitation by the plaintiff. The defendant also was ordered to "maintain whatever life insurance he [had] available through his employer, naming the plaintiff as beneficiary, so long as he [had] an alimony or child support obligation to her."

The court allowed the plaintiff to "retain any interests she may have to real property transferred to her by her mother" and her interest in a pending personal injury claim. She also was allowed to retain two of the parties' three cars, as well as "any interest she has in the 1958 Corvette."

The defendant was allowed to retain his retirement account and one of the parties' three cars, a Ford Focus. The parties were allowed to retain their respective bank

accounts, intellectual property, and personal belongings in their possession without any claim by the other. Each party was ordered to be responsible for debts listed on their respective financial affidavits and their own attorneys' fees. This appeal followed. Additional facts and procedural history will be set forth as necessary.

We first note the relevant and well settled standard of review in domestic relations cases. "An appellate court will not disturb a trial court's orders in domestic relations cases unless the court has abused its discretion or it is found that it could not reasonably conclude as it did, based on the facts presented. . . . The trial court's findings are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . [T]o conclude that the trial court abused its discretion, we must find that the court either incorrectly applied the law or could not reasonably conclude as it did." (Internal quotation marks omitted.) *Keenan* v. *Casillo*, 149 Conn. App. 642, 644–45, 89 A.3d 912, cert. denied, 312 Conn. 910, 93 A.3d 594 (2014). "In determining whether a trial court has abused its broad discretion in domestic relations matters, we allow every reasonable presumption in favor of the correctness of its action." (Internal quotation marks omitted.) *Von Kohorn* v. *Von Kohorn*, 132 Conn. App. 709, 713, 33 A.3d 809 (2011). "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Tracey* v. *Tracey*, 97 Conn. App. 122, 125, 902 A.2d 729 (2006).

"In reviewing the trial court's decision under [an abuse of discretion] standard, we are cognizant that [t]he issues involving financial orders are entirely interwoven. The rendering of judgment in a complicated dissolution case is a carefully crafted mosaic, each element of which may be dependent on the other." (Internal quotation marks omitted.) *Kunajukr* v. *Kunajukr*, 83 Conn. App. 478, 481, 850 A.2d 227, cert. denied, 271 Conn. 903, 859 A.2d 562 (2004).

I

The plaintiff's first claim is that the court abused its discretion in awarding her the marital home, but then ordering her to attempt to refinance the mortgage on the home at least once a year for eight years to eliminate the defendant's obligation on the mortgage, and to sell the home and keep the proceeds in the event that she could not refinance after eight years. The plaintiff maintains that there was no evidence that she would be able to refinance the home. Furthermore, the plaintiff contests the court's order because the evidence shows that she cannot obtain employment and has a poor

credit rating, and she claims that the order offends the long settled principle that the ability to comply is a material consideration in formulating financial awards.

The defendant argues that if the plaintiff has bad credit, it was due to her own admitted actions in over-drafting marital accounts and abusing the use of jointly held credit cards. The defendant notes, however, that the plaintiff's representation that she will be unable to restore her creditworthiness and refinance the marital home over the next eight years is exaggerated, as she has been able to pay the mortgage since it was modified pursuant to a pendente lite agreement of the parties approved and made an order of the court on September 4, 2012. Apart from the plaintiff's own testimony, the defendant argues, she failed to submit sufficient documentary evidence showing that she will be unable to obtain credit for a lengthy period of time.

In *Greco* v. *Greco*, 275 Conn. 348, 363, 880 A.2d 872 (2005), cited by the plaintiff, our Supreme Court held that financial orders that left the defendant destitute, while giving the plaintiff all significant marital assets as well as the defendant's entire salary, reflected an abuse of discretion. The court stated: "Under the trial court's order, the defendant was forced to the brink of abject poverty by his obligations to pay the required alimony and insurance premiums, and then stripped of any means with which to pay them by the disproportionate division of the marital assets. Such an order constitutes an abuse of discretion in light of the defendant's age, poor health and compromised ability to work." Id.; see also *Valentine* v. *Valentine*, supra, 149 Conn. App. 805 (court abused discretion in setting excessive financial orders and failing to take into consideration party's ability to pay). Similarly, in *Michel* v. *Michel*, 31 Conn. App. 338, 341, 624 A.2d 914 (1993), also cited by the plaintiff, this court held that a trial court's order that required the plaintiff to purchase life insurance reflected an abuse of discretion because there was no proof of the funds required to obtain it or any proof of the plaintiff's insurability.

Contrary to the plaintiff's argument, the defendant argues that the present case is not analogous to either *Greco* or *Michel* because the court's order neither forces the plaintiff to bear any additional, burdensome costs nor drives her to the brink of financial destitution. We agree with the defendant that the court did not abuse its discretion in determining that the plaintiff should either attempt to refinance the mortgage during the next eight years or, at the end of eight years, sell the home and keep any proceeds realized. The court's intention was to ensure that the defendant eventually would no longer remain liable on the mortgage when he was being awarded no share of the marital home, the parties' most significant asset, and the court did not abuse its discretion in determining that within eight years, the

plaintiff must choose between refinancing the marital home or selling it and keeping the proceeds.

In making its determination on the distribution of the marital property, of which the marital home was the parties' only substantial asset, the court found that the appraised value of the home was $476,000 and the mortgage balance was $330,000, as listed on the plaintiff's financial affidavit. Thus, the plaintiff, as sole owner of the home, was awarded equity of nearly $146,000. The court, in its decision, indicated that in determining the distribution of the marital assets, it considered the length of the marriage, the causes for the dissolution, the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities and needs of each of the parties, as well as the opportunity of each for future acquisition of capital assets and income. See General Statutes § 46b-81 (c). The court found that the plaintiff was in "reasonably good health," and that although she had a personal injury claim pending, "it [did] not appear to affect her earning capacity." As we noted earlier, the court also made reference to the plaintiff's actions that suggested her attempts to reduce the assets in the marital estate, including the following: "Immediately prior to the commencement of the action, the plaintiff removed at least $10,000 from various accounts; [she] . . . removed the china, silver, and her personal jewelry from the family home; [she] returned to her mother a 1958 Corvette that had been in the parties' possession for a few years, without the defendant's permission; [she] also returned to her mother deeds [conveying] to [her] property that had not been recorded."

In considering whether the court had a reasonable basis for its orders as to the marital home, we have reviewed undisputed evidence pertaining to the factors that the court considered in crafting its financial orders. The plaintiff's undisputed testimony showed that although the plaintiff, who is fifty-two years old, attempted to describe herself as someone who always had been a "stay at home" mother, she earned a college degree in communications from Pepperdine University and had consistently employed her writing and speaking talents throughout the marriage, as the parties attempted to write, film, and produce online programs, and create websites and online magazines. She testified that she believed she would begin to make money building websites and continuing with her publication of an online magazine. The defendant testified that the plaintiff's communication skills were such that she was nominated to run for election as first selectman, although she did not win. Woodstock Academy also contracted with her to serve as a host mother for international students, and in 2013, she had earned a gross of $18,000 from this contract.

On the basis of her communication skills and experi-

ence, which reflect a talented and responsible person, the court reasonably concluded that in addition to the rental income the property awarded to the plaintiff can produce[4] and the income for housing foreign students, the plaintiff could, over the next few years, at least be able to obtain weekly income equivalent to thirty-five hours of employment at minimum wage. The plaintiff also testified that although she currently had poor credit, she had checked out ways to reestablish her credit and she acknowledged that one way to build credit was to regularly pay on a house loan, which she had been doing. Her only documented evidence of a denial of credit was a 2011 letter of rejection of her application for a credit card from Chase Bank. She did not provide any evidence that she had inquired into refinancing the mortgage and had been rejected or any documentation that she was denied a student loan for her older son because her "credit was so poor."[5] The plaintiff also testified that she was expecting some compensation from a lawsuit she had filed in 2013 as a result of being rear ended in an automobile accident and already had been offered a settlement that she had rejected, an asset that the court permitted her to retain. The plaintiff's mother was paying her attorney's fees. The court also augmented her income by awarding her $250 per week in periodic alimony.

Despite the court's finding that the defendant had been the primary wage earner during the marriage, and had utilized savings and an inheritance of stock worth $50,000 from his father to pay bills, as well as evidence that the defendant also had contributed to the upkeep of and improvements to the marital home, the court awarded the defendant no interest in the home, but did determine that it was fair to remove him from liability on the mortgage after no more than an eight year period of time. In sum, there was a reasonable basis in the evidence for the court to conclude that in eight years' time, the plaintiff would be capable of continuing to pay the mortgage payments and improving both her income and credit circumstances in order to refinance the mortgage loan and relieve the defendant, who was not awarded any part of the parties' only significant marital asset, from any liability on the loan. If the plaintiff is unable to do this after eight years, she will have to sell the home, but at that time the parties' youngest child, born in 2003, will have attained majority and she will be able to keep any proceeds from the sale. We therefore conclude that the court's order was fair and equitable and that it did not constitute the imposition of a financial obligation on the plaintiff that she cannot possibly meet or that rendered her destitute. The court's orders with respect to the marital home do not offend the basic elements of fairness in light of the plaintiff's age, education, talents, good health, sources of unsalaried income, and ability to seek gainful employment.[6] She has not been ordered to refinance the home during

the next eight years, but only to make an attempt to do so. She can choose not to participate in a refinancing and elect to sell the home, in which the court determined she had substantial equity, pay off the mortgage and keep any proceeds of the sale. In view of financial orders and a property division where she obtained a greater share of the marital assets, we conclude that the court's division of the parties' sole significant asset was not disproportionately unfavorable to the plaintiff.

## II

The plaintiff's next claim is that the court erred by ordering child support and alimony based on gross, rather than net income.[7] In its memorandum of decision, the court stated, "[t]he order entered by this court takes into account the net income of the parties." The court then cited to several cases that indicate that a court must base child support and alimony orders on the available net income of the parties. Therefore, we conclude that there is no basis for the plaintiff's claim that the court based its child support or alimony award on gross income.

"[A] court must base its child support and alimony orders on the available net income of the parties, not gross income. . . . Whether . . . an order falls within this prescription must be analyzed on a case-by-case basis. Thus, while our decisional law in this regard consistently affirms the basic tenet that support and alimony orders must be based on net income, the proper application of this principle is context specific. . . . [T]he trial court is not required to make specific reference to the criteria that it considered in making its decision. . . . [T]he mere notation by the court of a party's gross earnings is not fatal to its support and alimony orders so long as its orders are not based on the parties' gross earnings." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *Szynkowicz* v. *Szynkowicz*, 140 Conn. App. 525, 530–31, 59 A.3d 1194 (2013).

In the present case, the court had before it the parties' financial affidavits, reflecting their net incomes,[8] and it specifically stated that it had considered the "amount and sources of income," and had taken "into account the net income of the parties" in fashioning periodic alimony and child support orders. The court further indicated that its award of $300 per week in child support, retroactive to May 20, 2013, and reduced to $215 per week as of the date the oldest child graduated from high school, June 27, 2014, was "in accordance with the child support guidelines," which would have required a consideration of the parties' net incomes. Although the court made passing references to the parties' gross incomes, it never stated that it was relying solely on their gross incomes. Facially, the court's consideration of alimony and child support included evidence of the parties' net incomes. The court was not required to

make explicit findings as to net income. See *Hughes* v. *Hughes*, 95 Conn. App. 200, 207–208, 895 A.2d 274, cert. denied, 280 Conn. 902, 907 A.2d 90 (2006). "[W]e allow every reasonable presumption . . . in favor of the correctness of [the trial court's] action." (Internal quotation marks omitted.) *Kelman* v. *Kelman*, 86 Conn. App. 120, 122, 860 A.2d 292 (2004), cert. denied, 273 Conn. 911, 870 A.2d 1079 (2005). Thus, in light of the foregoing, we conclude that the court did not improperly fashion its alimony and child support orders based on the parties' gross incomes and find no abuse of discretion.

### III

The plaintiff's final claim is that the court erred in retroactively modifying prior court orders for payment by the defendant of mortgage arrearages and fines. Specifically, the plaintiff claims that the court failed to order the defendant to pay $31,992 in mortgage payments that he previously had been ordered to pay during the pendency of the dissolution action. The plaintiff relies on, inter alia, a pendente lite order entered by the court, *dos Santos*, *J.*, on November 2, 2011. She also claims that the court failed to award her the sum of $16,200 as fines for the defendant's noncompliance with discovery. The plaintiff relies on a pendente lite order issued by Judge dos Santos on November 28, 2012, wherein the defendant was held in contempt and was assessed the sum of $150 a day for every day after December 10, 2012, on which he continued to fail to comply with the plaintiff's discovery requests contained in interrogatories and requests for production that she had filed on Feburary 8, 2012.[9]

In *Nowell* v. *Nowell*, 157 Conn. 470, 482, 254 A.2d 896, cert. denied, 396 U.S. 844, 90 S. Ct. 68, 24 L. Ed. 2d 94 (1969), our Supreme Court held that "[i]n a divorce or separation action, a husband cannot be punished for his civil contempt arising from noncompliance with preliminary injunctions after a final judgment has been rendered unless the final judgment itself awards damages for the civil contempt. . . . The defendant cannot be punished for violating these preliminary injunctions because final judgment has been rendered with no provision in that judgment for damages arising from the civil contempt." (Citation omitted.) Later, in *Tobey* v. *Tobey*, 165 Conn. 742, 745, 345 A.2d 21 (1994), our Supreme Court agreed with the ruling in *Nowell* and held that "where a final decree of divorce has been rendered, (any orders regarding pendente lite alimony are merged in the final decree) and thereafter, no independent action for contempt based on the temporary alimony order can be properly brought." The court, however, did not preclude a court from assessing and including in its final judgment an order ensuring payment of a financial obligation that had accrued as a result of noncompliance with pendente lite orders. In this regard the court stated: "Review may be made,

however, of that part of a final order which fails to cite a defendant for contempt or which fails to incorporate an accumulated arrearage of pendente lite alimony. . . . [T]he question is whether the court was in error in refusing to impose punishment for the alleged noncompliance with its pendente lite order." Id., 745–46.

We observe that, during the proceedings on remand before Judge Pinkus, the plaintiff argued that the court should order the defendant to pay her a mortgage arrearage in the amount of $31,992, which she claimed had accumulated over nine months, as well as fines for discovery noncompliance in the amount of $16,200. The plaintiff argued that the court was bound to enforce orders previously issued by Judge Gould following the first dissolution trial, which orders, she argued, had been upheld by this court during the prior appeal.[10]

On the basis of our review of this court's decision in *Valentine* v. *Valentine*, supra, 149 Conn. App. 799, however, we conclude that on remand, the court was not bound by any orders issued by Judge Gould with respect to a mortgage arrearage to be owed by the defendant or to the cumulative fines he assessed against the defendant for noncompliance with discovery. In *Valentine* v. *Valentine*, supra, 149 Conn. App. 800 n.1, we stated: "The defendant additionally claims that the court improperly: (1) determined that he was responsible for the mortgage arrearage on the marital home and improperly calculated the amount and form of such payment . . . (4) violated the stay of appeal in ordering him to pay various fines and fees; and (5) entered duplicitous orders with respect to the mortgage arrearage. In view of our decision on the two dispositive claims, it is not necessary to consider these other claims." We held that Judge Gould had violated the defendant's right to due process when it granted in part the plaintiff's motion for reconsideration and clarification without affording the defendant adequate notice and an opportunity to object and to be heard,[11] and further, that the court abused its discretion by entering financial orders that exceeded the defendant's weekly income. Id., 805.

This court concluded in its previous decision that it did not need to address the defendant's claims as to the mortgage arrearage and the payment of fines and fees because, as a result of its reversal based on several of the defendant's claims, the defendant would have an opportunity to address these issues pursuant to our remand order, which required "a new hearing on *all* financial issues." (Emphasis added.) Id., 808. This court noted that our review of financial orders entered by a trial court in a dissolution matter is governed by the " 'mosaic doctrine,' " which views financial orders as a seamless collection of interdependent elements, and concluded that because "at least two of the defendant's claims challenging the court's financial orders ha[d] merit, the entire set of them must fall, and a new hearing

[must] be held regarding [all of] them." Id., 803. Accordingly, any reliance by the plaintiff on orders previously issued by Judge Gould is unavailing.

A

We first consider the plaintiff's argument that the court erred in failing to award her $31,992 for nine monthly mortgage payments that the defendant did not pay between November 2, 2011 and September 4, 2012, despite a pendente lite order that required him to do so. The plaintiff maintains that an order issued by Judge Graziani on September 4, 2012, "specifically provided that the defendant was to remain responsible for the mortgage arrearage." We disagree with the plaintiff's characterization of that order.

The following additional facts are relevant. Just prior to hearing closing arguments, Judge Pinkus indicated, "I'm going to take into account what Judge dos Santos ordered, what Judge Munro ordered, what . . . every judge in the file ordered. I'll look at all of the orders. I'll take all of those orders into account. . . ."

A pendente lite order issued by Judge dos Santos on November 2, 2011, of which the court took judicial notice, required the defendant to pay the monthly mortgage payment on the marital home. During the plaintiff's testimony, her attorney called another pendente lite order to the court's attention dated September 4, 2012, based on an agreement of the parties approved by Judge Graziani, in which the plaintiff assumed responsibility for the mortgage payments effective that date. The September 4, 2012 agreement noted that a mortgage modification process had been initiated by the defendant and that it was still in progress at that time. It indicated that "[t]he defendant will continue to be responsible for the mortgage arrearage, *with any sum that may be due adjusted by the mortgage modification process if approved.*" (Emphasis added.) It also provided that although the plaintiff was responsible for the mortgage payments after September 4, 2012, she could allow them to accrue as an arrearage pending the mortgage modification process. The agreement further directed that the defendant, the sole obligor on the mortgage, was to negotiate as low a monthly payment as possible.

Judge Pinkus did not address the plaintiff's claim as to the mortgage arrearage in his memorandum of decision, and the plaintiff did not seek any articulation on that subject from the court. We can, however, derive from the trial transcript the court's factual findings relevant to the plaintiff's claim for the mortgage arrearage. Cf. *Murcia* v. *Geyer*, 151 Conn. App. 227, 230, 93 A.3d 1189 (record inadequate to review defendants' claim because court did not issue written or oral decision, defendants did not file notice pursuant to Practice Book § 64-1 or seek articulation, and no portion of trial transcript encompassed court's factual findings with

respect to defendants' claim), cert. denied, 314 Conn. 917, 100 A.3d 406 (2014).

At trial, in presenting the plaintiff's claim that the defendant should be found to still owe her the amount of mortgage payments that he failed to make between November 2, 2011 and September 4, 2012, the plaintiff's counsel indicated that on September 4, 2012, the parties agreed that the marital home would be transferred to the plaintiff, she would assume the mortgage payments and collect rents on the property, and "we would defer to another day the issue about [the defendant's] nonpayment of the mortgage. That's part of my claim for mortgage arrearages in the proposed orders." Plaintiff's counsel further represented that the marital home had been transferred to the plaintiff prior to the May 20, 2013 judgment of dissolution in order to "finalize the mortgage modification process prejudgment." The defendant indicated that he had transferred his interest in the marital home to the plaintiff shortly after May 20, 2013. Upon hearing these representations, the court concluded that both parties had agreed to the mortgage modification as a means of addressing the mortgage payment arrearage, and that the defendant had transferred his interest in the marital home to the plaintiff either at the time of the mortgage modification or shortly after the decision of Judge Gould on May 20, 2013.[12] The court concluded, "Oh, okay, so there's no— so the arrearage . . . is taken care of."[13]

On appeal, the plaintiff does not reference or dispute this finding by the court.[14] She only maintains that Judge Pinkus, just as she argues Judge Gould had done after the first dissolution trial, should have honored Judge Graziani's September 4, 2012 order, which she claims clearly held the defendant liable for the mortgage payments that he missed between November, 2011 and August, 2012.

That order, however, did not state what the plaintiff claims it did. It did not set forth an arrearage amount, it did not hold the defendant in contempt for failure to pay the mortgage, and it stated that any arrearage owed would be subject to adjustment upon the mortgage being modified. The interpretation of the court's order presents a question of law. See *Ottiano* v. *Shetucket Plumbing Supply Co.*, 61 Conn. App. 648, 651, 767 A.2d 128 (2001). We conclude that Judge Pinkus reasonably construed the order as the adoption of a joint agreement of the parties that, once the mortgage modification to the lowest possible monthly payment was accomplished, any arrearage accrued by either party during the time when the party was responsible for mortgage payments would be eliminated by the fresh start that the mortgage modification provided.

A similar issue arose in *Papa* v. *Papa*, 55 Conn. App. 47, 52, 737 A.2d 953 (1999), in which a defendant husband claimed that a pendente lite order requiring him

to make certain mortgage payments merged into the judgment of dissolution and terminated his obligation under that order. This court disagreed, and it noted that the parties in *Papa* had entered into a pendente lite agreement that the defendant would make the mortgage payments on the marital home which remained in effect until the time of dissolution. Id., 53. *Papa* is distinguishable from the present case because the trial court in *Papa*, in its decision, determined that the defendant owed an approximate aggregate amount of mortgage payments that the defendant, despite a court order, had neglected to pay. Id., 49, 52–53. This court concluded that the unpaid mortgage obligations ordered by the trial court in *Papa* were, in effect, debt payments that could not be taken away from the plaintiff wife when the final dissolution decree was rendered. Id., 53–54. This court reasoned: "Indeed, it would be error for a trial court . . . to fail to incorporate an accumulated arrearage of pendente lite alimony in a final order granting dissolution." (Internal quotations marks omitted.) Id., 55.

We conclude that the court in the present case reasonably could have determined that the record, including the September 4, 2012 order of Judge Graziani, that the parties' agreement to a mortgage modification process had eliminated the defendant's and the plaintiff's obligation for any mortgage payments for which either party was responsible prior to the date on which the mortgage modification was completed. The court ultimately awarded the plaintiff all right, title, and interest in the marital home, thus depriving the defendant of any legal or equitable interest in the parties' only significant asset. Thus, an abuse of discretion has not been shown in the court's refusal to award an arrearage amount to the plaintiff for the period of time in which the defendant failed to pay the monthly mortgage.[15]

B

Next, we address the plaintiff's claim that the court should have awarded her $16,200 for the defendant's violation of a pendente lite order concerning compliance with her discovery requests. We agree with the plaintiff that the court should have awarded an amount to the plaintiff as a sanction for the defendant's discovery noncompliance, but we do not find any support in the record for the exact amount that the plaintiff claims. Hence, we reverse the judgment in part and remand the matter with respect to this claim solely for a hearing to determine the amount of sanctions that should have been awarded to the plaintiff and the method by which the defendant must pay them.

We have undertaken an extensive review of the record and begin by setting forth the procedural history of the parties' discovery saga.[16] At the time that the plaintiff filed her complaint seeking a dissolution, she also filed a "Mandatory Disclosure and Production

Request" dated September 27, 2011.[17] The plaintiff alleged that on February 8, 2012, she propounded interrogatories and requests for production to the defendant, which he received on February 10, 2012. She also alleged noticing a deposition of the defendant for March 6, 2012, on February 9, 2012, which she served on the defendant on February 10, 2012. The defendant did not file any objections to the plaintiff's requests. On April 11, 2012, the plaintiff filed a motion to compel the defendant to respond to her interrogatories, requests for production, and deposition notice, in which she sought counsel fees and other sanctions. This motion to compel was heard on September 4, 2012, and Judge Graziani, pursuant to an agreement of the parties, ordered both parties to comply with all discovery requests within thirty days.

On October 26, 2012, the plaintiff filed a motion for contempt with multiple counts. The fourth count sought to have the defendant held in contempt for his failure to respond to her February 8, 2012 interrogatories and requests for production in accordance with the order entered by Judge Graziani on September 4, 2012.[18] On November 13, 2012, the plaintiff filed a request for production with the court, seeking a variety of documents dated back to January 1, 2011. A hearing was held on the plaintiff's October 26, 2012 motion for contempt before Judge dos Santos on November 28, 2012. In her proposed orders, the plaintiff alleged that "the defendant has never responded to the interrogatories and never provided a single document" in compliance with her February 8, 2012 production requests.

On November 28, 2012, after a hearing, the court found the defendant in wilful contempt with respect to the allegations contained in the fourth count of the plaintiff's October 26, 2012 motion for contempt. The court ordered the defendant to "respond fully to all questions in the plaintiff's interrogatories and comply with all discovery requests by December 10, 2012." The court indicated that if the defendant failed to answer all of the interrogatories and to provide all of the items listed in the requests for production by December 10, 2012, the defendant was to be sanctioned $150 for each day until the defendant was in compliance. The defendant also was ordered to pay attorney's fees incurred by the plaintiff in the amount of $3250.[19] The court continued the matter to December 19, 2012, to monitor compliance with its orders. On December 19, 2012, Judge dos Santos again found the defendant in wilful contempt of the court's November 28, 2012 order for his failure to respond fully to all questions in the plaintiff's interrogatories and to provide all items listed in her requests for production, and noted that pursuant to the court's prior order, the defendant would be sanctioned $150 for each day from December 10, 2012 until he was in compliance.[20]

On January 4, 2013, the defendant filed an appeal from the order of December 19, 2012. This appeal resulted in a per curiam opinion in *Valentine* v. *Valentine*, 146 Conn. App. 907, 77 A.3d 215 (2013), released on October 29, 2013, in which this court summarily upheld the order, finding no error. Accordingly, that portion of the order now at issue, which assessed the defendant a fine of $150 a day for every day beyond December 10, 2012, that he remained in noncompliance with the plaintiff's discovery requests of February 8, 2012, was upheld.[21] We find nothing in the record, however, subsequent to December 19, 2012, to reflect that the court determined the exact number of days during which the defendant remained in noncompliance with plaintiff's discovery requests after December 10, 2012.

On January 24, 2013, the plaintiff filed another motion for contempt alleging the defendant's continuing noncompliance with discovery.

On March 13, 2013, the court, *Munro, J.*, issued the following order with respect to the defendant's providing the plaintiff with discovery:

"The defendant will provide the plaintiff discovery as follows:

"a. Bank records for all existing accounts, including statements, canceled checks and deposit tickets/records for the past three years (2010, 2011 and 2012) will be produced within fourteen days. Defendant will provide a statement under oath that no other accounts exist within seven days.

"b. Income records, including W2s, 1099, copies of any checks received for work done and tax returns, for the past three years will be produced within fourteen days. Defendant will provide a statement under oath that no other income records exist within seven days.

"c. Credit card statements for the past three years (2010, 2011 and 2012) will be produced within fourteen days."

We cannot determine from the record whether the March 13, 2013 order was an attempt to resolve all issues pertaining to discovery noncompliance or only the issues raised in the plaintiff's January 24, 2013 motion for contempt. There is no mention of any fines owed by the defendant in the March 13, 2013 order. Rather, the order states that "outstanding motions will be addressed at trial." On April 5, 2013, the plaintiff filed another motion for contempt alleging that the defendant had not paid the fines imposed on December 10, 2012, by Judge dos Santos and that he had failed to fully comply with the discovery order issued by Judge Munro on March 13, 2013, although plaintiff alleged that the defendant had sent the plaintiff, at some undesignated time, 978 pages of "largely duplicative information."

On April 30, 2013, however, the plaintiff, in her

amended proposed orders, did not list as outstanding motions either her January 24, 2013 motion for contempt or her April 5, 2013 motion for contempt, both of which addressed the defendant's discovery noncompliance. She did, however, claim that $16,200 in fines for discovery noncompliance remained outstanding and unpaid by the defendant pursuant to the orders of Judge dos Santos on November 28, 2012.

On the second day of trial, September 10, 2014, the plaintiff testified that she was owed $16,200, without specifying how that sum had been derived. She admitted that she was "not sure of the amount." The plaintiff's attorney advised the court that the claim for $16,200 in fines was based on the November 28, 2012 order of Judge dos Santos and that the court should honor the finding of Judge Gould that the defendant owed $16,200 because it had been affirmed on appeal. The court advised counsel for the plaintiff that it doubted if any judge ever actually had found what the accumulated amount of fines for discovery noncompliance would be. The court then indicated that, to resolve the issue, it would have to make a finding that the plaintiff never received the information requested in discovery, but that once it was clear that she did receive the information, either from the defendant or through her own efforts, for example, through the use of subpoenas, there was "no additional reason for the penalty" of $150 per day.

Ultimately, the court appeared to suggest that the plaintiff was overreaching on this claim, as it advised plaintiff's counsel that it would not award the plaintiff $150 per day. Furthermore, the court stated that "[i]f it cost you money and time to go do that yourself, maybe you can get that money and time paid for, but you're not going to get both."[22] In its memorandum of decision, in considering the plaintiff's claim for the fines that had accrued pursuant to the November 28, 2012 order of Judge dos Santos, the court stated that it was "not entirely clear from the court [record] when the plaintiff did in fact receive discovery, and [accordingly] the court [was] not inclined to impose fines on the defendant for his failure to comply."[23]

Although, as stated previously, we conclude that the court was not bound by Judge Gould's finding that the defendant owed the plaintiff fines in the amount of $16,200, we do agree with the plaintiff that the court should not have ignored the prior finding of contempt by Judge dos Santos and the sanctions that he ordered on November 28, 2012, as a result of the defendant's failure to comply with the plaintiff's February 8, 2012 discovery requests.[24] As we noted earlier, the court indicated that in order to assess any discovery fines, it would have to make a finding that the plaintiff never received the information requested in discovery, but that once it was clear that she got the information,

either from the defendant or through her own efforts, there was no reason for any penalty to be imposed. Ultimately, the court declined to find that the defendant owed any of the $16,200 in fines claimed by the plaintiff. The court found that "[t]he parties' finances were not at all complicated," that the defendant never attempted to hide anything from the plaintiff, that "the plaintiff had equal access to most of the accounts that existed prior to the commencement of the action,"[25] and that "the plaintiff was able to obtain all necessary discovery herself, or from the defendant, or by subpoena from the various financial institutions." The court also found that the "plaintiff was not prejudiced by any nondisclosure by the defendant." As a result, the court impermissibly ignored the series of contempt findings and orders of Judge dos Santos in November and December, 2012, and shifted the burden of proving noncompliance with plaintiff's discovery requests back to the plaintiff, when she already successfully had met that burden in late 2012 by persuading the court to hold the defendant in contempt.

"The interests of orderly government demand that respect and compliance be given to orders issued by courts possessed of jurisdiction [over] persons and subject matter. One who defies the public authority and willfully refuses his obedience, does so at his peril." (Internal quotation marks omitted.) *Edmond* v. *Foisey*, 111 Conn. App. 760, 767, 961 A.2d 441 (2008). The court's actions, in refusing to consider calculating and assessing the previously imposed fines, based on a determination of how long the defendant remained noncompliant with the orders of Judge dos Santos, ignored the importance of compliance with the court's orders and effectively endorsed the defendant's continuous disregard for them.[26]

The type of contempt found in the present case is civil contempt. "[C]riminal contempt is conduct . . . directed against the dignity and authority of the court," whereas "civil contempt is conduct directed against the rights of the opposing party." *Board of Education* v. *Shelton Education Assn.*, 173 Conn. 81, 85, 376 A.2d 1080 (1977). "A contempt is considered civil when the punishment is wholly remedial, serves only the purposes of the complainant, and is not intended as a deterrent to offenses against the public. . . . Sanctions for civil contempt may be either a fine or imprisonment; the fine may be remedial or it may be the means of coercing compliance with the court's order and compensating the complainant for losses sustained." Id. The purpose of the $150 daily sanction imposed in the present case was to coerce compliance with the court's prior orders. Subsequent to Judge dos Santos' findings and sanctions that were ordered on November 28, 2012, the defendant retained the right either to comply or to demonstrate that all or part of his noncompliance was excusable.[27] He failed to take either of these actions

proactively, although for some period of time he still was represented by counsel. To toll the accumulation of the daily $150 fine imposed, the defendant needed to establish, in a measured way, that he had complied or was unable to do so. The ascertainment of what fines, if any, were owed pursuant to the court's order required evidence, and not mere representations of counsel or a self-represented defendant while not under oath or subject to cross-examination. See *Kelly* v. *Kelly*, 54 Conn. App. 50, 60, 732 A.2d 808 (1999) ("[a] judgment of contempt cannot be based on representations of counsel in a motion, but must be supported by evidence produced in court at a proper proceeding" [internal quotation marks omitted]). Unfortunately, at trial, much of the presentation of the plaintiff's claim for the fines, and the defendant's responses thereto, were argumentative, not evidentiary.

In the dissolution case of *Ramin* v. *Ramin*, 281 Conn. 324, 915 A.2d 790 (2007), our Supreme Court concluded that the trial court had abused its discretion in refusing to consider a plaintiff's motion for contempt and request for sanctions based on a defendant's repeated failure to comply with discovery orders. Id., 336, 345. One of the improper reasons that the trial court had considered to excuse the defendant's noncompliance is similar to a reason expressed by the court in the present case for its not assessing any sanctions: the fact that the plaintiff had obtained some of the information that she needed on her own at her own expense, for example, through the use of subpoenas. Id., 343. Such a ruling, that a party's noncompliance with discovery may be excused if the other party manages to obtain the requested information in some other manner, illustrated "precisely how a court's abdication of its responsibility to oversee the discovery process, when confronted with a consistently noncompliant party, benefits the wrongdoer and encourages him to persist in his noncompliance." Id., 344.

In sum, we conclude that the court erroneously absolved the defendant from his obligation to pay *any* fine arising from his noncompliance with the plaintiff's discovery requests. It did so without justification. The court ignored a previously adjudicated pendente lite contempt motion—which sought to provide the plaintiff with discovery information that she appropriately had requested and had claimed to never have fully received—and the sanctions that had resulted. Granting such wholesale leeway to the defendant "encourage[s] spouses to delay [abiding by a pendente lite order] until the time of dissolution, hoping that the [pendente lite] order . . . would be forgiven or changed at that time." *Elliott* v. *Elliott*, 14 Conn. App. 541, 545, 541 A.2d 905 (1988). Placing the burden on the plaintiff rather than on the defendant, who was found to have failed to comply fully with the court's orders, would be inconsistent with the decision in *Billington* v. *Billington*, 220

Conn. 212, 595 A.2d 1377 (1991), in which our Supreme Court articulated the requirement of full and frank mutual disclosure in marital cases. Id., 219–22. In doing so, the court analogized the marital relationship, even in the context of a dissolution case, to "the special relationship between fiduciary and beneficiary," insofar as the requirement of disclosure is concerned. Id., 221.

In the present case, the defendant, after having been found in contempt for noncompliance with discovery, should have been required to specifically establish, with evidence, if and when he fully complied with the plaintiff's February 8, 2012 discovery request subsequent to December 10, 2012, the day on which the $150 daily fine began to accrue.[28] Having previously established her entitlement to relief, it was not the plaintiff's burden to demonstrate, once again, the defendant's failure to comply with discovery.

Accordingly, we conclude that the court abused its discretion in declining to determine the amount of an award to the plaintiff for the amount of fines that had accumulated pursuant to the November 28, 2012 order of Judge dos Santos between December 10, 2012 and May 20, 2013. The court first should have determined what answers to interrogatories and what documents were sought by the plaintiff in her February 8, 2012 interrogatories and requests for production, as well as what remained outstanding as of November 28, 2012. It was then the defendant's responsibility to demonstrate, with evidence, that he either had provided the plaintiff with answers to those interrogatories and the documents requested or that it was impossible for him to fully comply through no fault of his own.

Finally, we turn to a consideration of a proper remedy. "We previously have characterized the financial orders in dissolution proceedings as resembling a mosaic, in which all the various financial components are carefully interwoven with one another. . . . Accordingly, when an appellate court reverses a trial court judgment based on an improper alimony, property distribution, or child support award, the appellate court's remand typically authorizes the trial court to reconsider all of the financial orders. . . . We also have stated, however, that [e]very improper order . . . does not necessarily merit a reconsideration of all of the trial court's financial orders. A financial order is severable when it is not in any way interdependent with other orders and is not improperly based on a factor that is linked to other factors. . . . In other words, an order is severable if its impropriety does not place the correctness of the other orders in question." (Citations omitted; internal quotation marks omitted.) *Maturo* v. *Maturo*, 296 Conn. 80, 124–25, 995 A.2d 1 (2010). We conclude that in the present case, a remand for a rehearing on the issue of the plaintiff's claims for accrued fines as a result of the defendant's being held in contempt for

discovery noncompliance, pendente lite, is a severable issue that requires factual findings by the trial court. The contempt sanctions sought by the plaintiff are unrelated to the other financial orders regarding alimony, child support, and property division. If the defendant owes any amount of accumulated fines to the plaintiff, such a finding would not call into question any of the court's other financial orders, and it would unfairly reward the defendant if the accrued fines possibly were considered as grounds to adjust other financial awards made to the plaintiff.[29]

The judgment is reversed in part and the case is remanded for a new hearing to determine the specific amount of fines owed to the plaintiff in connection with the court's finding and order of contempt dated November 28, 2012, and for a determination of an appropriate order for payment thereon. The judgment is affirmed in all other respects.

In this opinion the other judges concurred.

[1] At the time of the first judgment, the parties had resolved issues of custody and visitation by way of a parenting agreement that the court, *Adelman, J.*, previously had approved. See *Valentine* v. *Valentine*, 149 Conn. App. 799, 801 n.2, 90 A.3d 300 (2014).

[2] In fact, the plaintiff testified she had last sold a screenplay in 1990, the year that the parties were married.

[3] In the order pertaining to alimony, the court indicated that "[i]n the event any adjustments are required due to prior orders, credits or payments shall be at the rate of $25 per week."

[4] In fact, the home also has a third rental unit, which the plaintiff was occupying as her bedroom.

[5] Apart from bad credit, the plaintiff's lack of a salaried income and her failure to file tax returns for the past three years also may have negatively affected any loan or credit applications.

[6] The plaintiff testified that she had looked "for all kinds of jobs," but that at the time of trial she had only one application pending for a job at the Woodstock Academy. She testified that she still believed that what was really going to make her money was doing what she had done in the last few years, which included building websites and continuing to run her online magazine despite the fact that these ventures had not generated much income and she had no clients as a website manager. During the plaintiff's closing argument, subsequent to plaintiff's counsel describing the plaintiff's "ventures" during the marriage to help produce income as "worthwhile to her," the court stated, "[y]eah, but if she instead of renting the house out to those kids that she has to feed, if she could move back into the house, rent that third apartment and get a job, she may be able to do better."

[7] The plaintiff also disputes the court's findings as to gross income as inaccurate, but because we conclude the court based its award of child support and alimony on the parties' net incomes, we need not address this claim, which was not part of the plaintiff's revised preliminary statement of issues.

[8] Both parties had submitted financial affidavits depicting their claimed net incomes after mandatory deductions. The plaintiff claimed a net weekly income of $739.96 and the defendant claimed a net weekly income of $1021.94. The plaintiff also submitted a child support guidelines worksheet, which reflected the amounts she claimed the defendant should be ordered to pay for child support. In her testimony, the plaintiff requested that the court award her $215 per week for one child, and $300 per week for the period of time when both children were under the age of eighteen. The court's child support order granted her request. She further requested $375 per week in alimony for fourteen years. In closing argument, the plaintiff requested a child support order in accordance with the guidelines, which the court granted to her, and she requested an unspecified amount of alimony for fourteen years. The court awarded her alimony in the amount of $250 per week without any durational limit.

[9] Although the record reflects that the plaintiff also claimed she was owed

accumulated fines for the defendant's failure to attend a parenting education course and payment of $3250 in attorney's fees ordered by Judge dos Santos on November 28, 2012, and again by Judge Munro on March 13, 2013, plaintiff's counsel conceded during trial that the $3250 had been paid. As to the claim for fines relevant to the failure of the defendant to attend a parenting education course, the plaintiff has not briefed that claim and we deem it abandoned.

[10] We emphasize, however, that there is nothing in the record before this court that indicates, prior to the issuance of financial orders pursuant to the judgment of dissolution on May 20, 2013, all of which were reversed and remanded for a new hearing as a result of the defendant's appeal, that any judge, including Judge Gould, ever indicated the basis for the calculation of the specific amounts of mortgage arrearages and discovery noncompliance fines that the plaintiff claimed were owed to her by the defendant.

[11] In granting the plaintiff's motion for reconsideration after the first dissolution trial, Judge Gould, without affording the defendant an opportunity to object or to be heard, ordered the defendant to pay a mortgage arrearage amount that included all mortgage payments due on the marital home from November, 2011, until such time as the defendant, subsequent to the May 20, 2013 dissolution orders, deeded the property to the plaintiff. This order was in complete derogation of a pendente lite order issued by Judge Graziani pursuant to the parties' agreement, on September 4, 2012, which made the plaintiff responsible for mortgage payments due on the marital home effective that date and exceeded the amount claimed by the plaintiff. In her brief, the plaintiff concedes that if the defendant owes any mortgage arrearage, it is only for nine months of missed mortgage payments.

[12] We note that the deed from the defendant to the plaintiff is not in evidence.

[13] Subsequent to the first judgment of dissolution issued by Judge Gould, the plaintiff filed a motion for reconsideration and clarification in which she admitted that there is an "ambiguity . . . because the parties participated in mortgage modification, which altered the mortgage payment for the home by re-capitalizing unpaid mortgage payments which added them to the principal balance. This theoretically eliminates any 'past due payment,' and thus arguably relieves the defendant of the order to pay the unpaid mortgage payments."

[14] Subsequent to the September 4, 2012 agreement, the plaintiff filed a comprehensive motion for contempt dated October 24, 2012, which contained a number of counts seeking contempt findings and fines, but it did not seek payment of any mortgage arrearage allegedly owed by the defendant; it only sought confirmation of the progress of the mortgage modification process. On January 24, 2013, the plaintiff filed a motion for contempt regarding payment of the mortgage, pendent lite in which she claimed a fourteen month arrearage "totaling in excess of $32,000" and made no reference to the September 4, 2012 order of Judge Graziani, which obligated the plaintiff to pay the mortgage commencing in September, 2012, or the November 2, 2011 order of Judge dos Santos, which only obligated the defendant to pay the mortgage payment commencing November, 2011. Just before the first trial before Judge Gould, the plaintiff asked the court to rule on this pending motion. By that time, the mortgage had been modified. The defendant was never held in contempt for failure to pay the mortgage during the period for which he was obligated pursuant to the order of November 2, 2011.

[15] Further, we note that the plaintiff never presented any evidence to the court that calculated the exact amount that was unpaid during that nine month period, an amount which also should have taken into account the defendant's prior payments on the mortgage arrearage as a result of Judge Gould's orders. Despite the automatic stay imposed after the defendant's second appeal, these orders secured $200 or $400 per week by way of a wage garnishment for an undisclosed time period after the first judgment of dissolution was entered on May 20, 2013. See *Valentine* v. *Valentine*, supra, 149 Conn. App. 802 n.3. At trial, the plaintiff admitted to receiving $800 a month for mortgage arrearage payments, but she stated that she did not use the money to pay down the mortgage principal. The defendant also claimed that even if he owed payments for the mortgage arrearage, the amount that the plaintiff was claiming was too high.

[16] Family practitioners would be well advised to consider avoidance of the tortuous process of filing and refiling nondescript contempt motions, which occurred in the present case to compel discovery, and consider utilization of §§ 25-32A and 25-32B of the Practice Book. Practice Book § 25-

32A, which took effect on August 15, 2011, states: "If a party fails to comply with a discovery request or a discovery order in any manner set forth in Section 13-14 (a), the party who requested such discovery or in whose favor the discovery order was made may move to compel compliance with the request or order. The moving party shall specify in a memorandum in support of his or her motion the discovery sought and the remedy sought. The party to whom the discovery request or order was directed shall, in a memorandum, specify why the discovery has not been provided or why such party has not complied with the discovery order. If the party to whom the discovery request or order was directed claims that the discovery has been provided or order has been complied with, he or she shall detail with specificity what discovery was provided and how compliance with the discovery order was made." Practice Book § 25-32B provides: "The judicial authority may appoint a discovery special master to assist in the resolution of discovery disputes. When such an appointment is made, the judicial authority shall specify the duties, authority and compensation of the discovery special master and how that compensation shall be allocated between the parties."

In the present case, informing the court and the defendant in writing as to what items were specifically required for discovery compliance and providing the defendant with an opportunity to specifically respond in writing may have led to an earlier, and less costly, resolution of the issue. In the alternative, the court could have enlisted the assistance of a special master to resolve the issue as opposed to imposing the accumulation of fines and subsequently paying scant attention to the achievement of a timely and satisfactory resolution of the discovery dispute.

[17] See Practice Book § 25-32.

[18] This motion did not seek to have the defendant held in contempt for failing to attend a deposition.

[19] Because the court's order also addressed other contempt issues, it is not clear on what the attorney's fees had been expended. The court did not rule on a motion to compel filed by the plaintiff on November 28, 2012, seeking sanctions for the defendant's failure to comply with the request for production served on the defendant and filed with the court on November 13, 2012. Such a ruling would have been premature, as the defendant had thirty days to comply with any discovery request. See Practice Book §§ 13-7 and 13-10. Thus, the daily fine imposed by Judge dos Santos did not pertain to the defendant's lack of compliance, if any, with the plaintiff's November 13, 2012 discovery requests.

[20] Practice Book § 13-14, applicable to family matters pursuant to Practice Book § 25-31, provides in relevant part: "(a) If any party has failed to answer interrogatories or to answer them fairly . . . or has failed to respond to requests for production . . . the judicial authority may, on motion, make such order as the ends of justice require. . . ."

[21] It would not appear that enforcement of the $150 per day fine was stayed as a result of the defendant's appeal from the December 19, 2012 order, due to the fact that the prior contempt finding and orders of November 28, 2012, in which the daily fine was first imposed, were not the subject of the defendant's appeal. The plaintiff did move to terminate the automatic stay, but there is no record of any ruling on that motion.

[22] The plaintiff also was seeking an award of attorney's fees for, inter alia, time spent in trying to enforce the defendant's compliance with discovery. The court did not award the plaintiff any attorney's fees.

[23] The plaintiff claimed, through her counsel, that Judge Gould made a finding that the defendant was in compliance with discovery at the commencement of the first trial, but we find nothing in the record to confirm such a finding was ever made.

[24] The plaintiff also filed additional discovery requests on November 13, 2012, immediately prior to Judge dos Santos' order of November 28, 2012. We observe that due to the fact that the defendant would have to have been allowed thirty days to comply with the subsequent request, it could not have been the subject of the contempt proceeding held on November 28, 2012. See Practice Book § 13-10. It also is not clear whether Judge dos Santos' December 19, 2012 order also found the defendant to be noncompliant with the plaintiff's November 13, 2012 discovery requests.

[25] The defendant maintained at trial that the plaintiff violated a November 2, 2011 order of Judge dos Santos by not providing the defendant access to his business computer, which he claimed impaired his ability to comply with discovery, The plaintiff admitted to removing some of the computers in the marital home and taking them to Ohio on September 27, 2011.

[26] We acknowledge the court's concern, as expressed to plaintiff's counsel, that the defendant, due to his financial situation and the plaintiff's other requested financial orders, might have had difficulty paying the amounts claimed for the mortgage arrearage and fines. The court indicated, "I understand you want to get paid, but you have to show me the pile of money I'm supposed to pay it from because I don't see it." As noted previously, however, upon the defendant's appeal to this court of the finding of contempt and the sanctions ordered, this court upheld them, signifying that they were found not to be coercive, punitive, or absolute.

[27] There is always the question of whether the contemnor indeed has the ability to purge himself when there has been a punishment imposed. Otherwise, the sanction imposed would cease to be remedial and become wholly punitive in actual operation. As the order of per diem fines until purged entered in this case does not specify precisely what discovery the defendant had to provide to the plaintiff in order to purge himself, it may be that on remand he can show that he met all those requirements which were reasonably within his power to meet. See *Mays* v. *Mays*, 193 Conn. 261, 266–67, 476 A.2d 562 (1984). In addition, the defendant may be able to claim credit for $200 weekly payments that were deducted from his paycheck by means of a wage withholding order issued by Judge Gould, after the first dissolution trial, and that were designated to satisfy, inter alia, fines that the court found he owed to the plaintiff due to his noncompliance with discovery requests.

[28] Minimally, because the court, on December 19, 2012, found that the defendant had not fully complied with discovery pursuant to its November 28, 2012 order, he would owe nine days of fines at the rate of $150 per day.

[29] We note that in *Elliott* v. *Elliott*, supra, 14 Conn. App. 548, we reversed the trial court's judgment and remanded the case with direction only to modify the judgment to include the pendente lite alimony arrearage and to reinstate the wage execution order securing payment on the arrearage. All other financial orders were affirmed.